**The LAB OIL COMPANY et al., Appellants,**

v.

**Mrs. Ella L. BENTZ et al., Appellees.**

**No. 14.**

Court of Civil Appeals of Texas.

Corpus Christi.

June 25, 1964.

Edmond Ford, Jr., Corpus Christi, W. B. Moss, Sinton, for appellants.

Marshall Boykin, of Wood & Boykin, Corpus Christi, Joe Ternus, Sinton, for appellees.

NYE, Justice.

This suit was one brought by the appellees Ella L. Bentz, a widow, Francis L. Bentz and wife Faye Bentz, and Charles N. Bentz and wife Estelline Bentz, called hereinafter Bentz, seeking the cancellation and termination of an oil, gas and mineral lease and praying for removal of the cloud from the appellees' title to the land by virtue of such lease, on the theory that after the expiration of the primary term, the lease terminated due to cessation of production or efforts to obtain production. The appellants, M. Liedeker, Sr., Paul A. Alford and Fred Bowman, individually and as partners, d/b/a Lab Oil Company, called hereinafter Lab, contend that this is a particularly drawn lease and that the word "operations" as used in the habendum clause of the lease was intended to cover activities of operating the lease and not development operations, and that such activities prevented such lease from terminating.

The lease in question covered two non-contiguous tracts of land in San Patricio County, about one mile west of Sinton,

Texas, one of approximately 11.75 acres and another of 68.25 acres. Bentz, on April 5, 1960, executed the subject oil, gas and mineral lease to Joe W. Thomas, one of the defendants and appellants herein, who thereafter assigned the lease to Lab, retaining an overriding royalty interest, one half of which Thomas assigned to A. Loy Sims.

Shortly after Lab received the assignment of the above lease, they commenced reworking three wells on the leased premises, one on the 68.25 acre-tract and two on the 11.75 acre-tract. Two wells were abandoned as dry holes. The other well, on the 11.75 acre-tract, was completed as a gas well in July or August of 1960 and was immediately connected to a gas purchaser's line, and gas was sold to the purchaser. No oil was ever produced from the lease and this gas well was the only well on the lease that marketed any production. After Lab completed the reworking of this well and the laying of the pipeline to the purchaser, no other drilling or reworking on any well on any of the leased property was performed by Lab, nor did they engage in building lines or otherwise improving or repairing the leasehold or the equipment located on the lease.

Small quantities of gas were sold on a consistently decreasing basis from August, 1960, until February, 1961. For instance, the total revenue from ⅞ths production in August, 1960, was $79.17, decreasing some each month until only $5.52 was received from production in February, 1961. During the next eight months no gas was sold and no shut-in gas payments were paid to Bentz.

On or about October 10, 1961, more than seven months after Lab stopped selling gas, Bentz executed and delivered another oil and gas lease on a portion of the same land to Charles F. Haas and Richard E. Haas, d/b/a Haas Brothers, and Charles F. Brocate and Donald Sharp, all intervenors in the suit below and appellees here. Shortly thereafter, in November, 1961,

sales by Lab were recommenced and continued up to the date of the filing of this suit. Total revenue per month received during this later period from sales varied from $1.64 to $12.64 per month.

The trial was held before the court without a jury. Judgment was rendered in favor of the plaintiff Bentz and intervenors, declaring the subject lease, as well as all interest therein, reserved and/or assigned to Lab, J. W. Thomas, and A. Loy Sims, terminated as of, on or before December 1, 1962, and cancelling and removing the cloud on their title. Lab perfected its appeal to this court, assigning fourteen points of error.

Paragraph number two of the oil and gas lease contains the habendum clause. It is this clause that gives rise to this controversy. It reads as follows:

"2. Subject to the other provisions herein contained, this Lease shall be for a term of ninety (90) days from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land or *operations are conducted on the land covered hereby* or this Lease is otherwise maintained as hereinafter provided." (Emphasis supplied)

The controlling question on this appeal is the meaning of the phrase contained in the habendum clause of the lease which could extend the duration of the effective term of the lease beyond its primary term. Such phrase, " * * * as long thereafter as * * * operations are conducted on the land covered hereby * * *", should according to Lab, be construed to mean: as long thereafter as * * * activities are conducted on the land covered hereby, even if the expenses of conducting those activities were greater than the revenue from resulting production.

The trial court found, based on sufficient evidence, that the primary term had expired; that the defendants ceased operations, as that word is used in paragraph

two of the subject lease, sometime in July or August of 1960; that "After completion of the No. 1 Ella Bentz 'B' Well and connecting same to the pipeline, defendants conducted no operations on the leased premises as that term is used in paragraph two (habendum clause) of the lease under which defendants claim"; that "the defendants did not produce gas in paying quantities from the lease under which defendants claim after the expiration of the primary term of the lease"; that "there was no well capable of producing in paying quantities and shut-in"; that "there were no drilling, reworking or other developing operations conducted on the premises after the primary term"; that the court found and concluded "that the clause 'or operations are conducted on the land covered thereby' as used in paragraph two of the subject lease (the Thomas lease) is not ambiguous; but I also conclude and find that even if ambiguous, under all the evidence admitted and offered, the parties to such lease did not intend that 'operations', as that term is used in said clause, would include those acts of the defendants since completion of the number 1 Ella Bentz 'B' well and the connecting of same to the pipeline sometime in July or August of 1960." The court concluded that: "the lease under which the defendants claim terminated on or before December 1, 1962, and by reason of such termination the plaintiffs, Ella L. Bentz, Francis L. Bentz and wife Faye Bentz, Charles L. Bentz and wife Estelline Bentz, and the intervenors Charles F. Haas and Richard E. Haas, individually and d/b/a Haas Brothers and Charles P. Brocato and Donald Sharp, are entitled to removal of said lease and any assignments thereof or interest therein as clouds upon their respective titles."

Lab contends that irrespective of the foregoing, the term of the lease continued because certain "operations", as that word or expression is used in the habendum clause and as contemplated by the parties, were conducted continuously upon the lands covered thereby sufficiently to hold the lease. The activities claimed by Lab to amount to "operations" after the primary term of the lease had expired, are as follows: (1) production of gas continuously (although in very small quantities) to the house of Bentz for domestic purposes, (2) making well pressure reports and monthly production reports to the Railroad Commission of Texas, (3) going upon the lease two or three times a month and occasionally turning the valve on and off, (4) keeping books on the well and the lease and distributing small gas royalty payments from the sale of gas during certain intervals to the Bentz and those otherwise entitled.

The oil, gas and mineral lease must be considered as a whole in order to give effect to its general purpose and the true intentions of the parties. The court will examine and consider the entire writing, seeking if possible to harmonize and give effect to all provisions of the lease so that none will be rendered meaningless. Universal C. I. T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154 (1951). The lessee's interest in this lease is a determinable fee because the lease terminates upon the happening of the events upon which it is limited. The conditions contained in the habendum clause are limitations which may determine the term or the ending of the lease. Stanolind Oil & Gas Co. v. Barnhill, 107 S.W.2d 746 (Tex.Civ. App., Writ Ref. 1937); Gulf Oil Corp. v. Reid, 161 Tex. 51, 337 S.W.2d 267 (1960). We must look at the whole lease, giving effect to the construction of the language contained within the four corners of the instrument, for the effect of these limitations. Benge v. Scharbauer, 152 Tex. 447, 259 S.W.2d 166 (1953). The lease provides that it shall remain in force for a term of ninety days and "as long thereafter as oil, gas or other mineral is produced * * *." This limitation clause does not say "produced in paying quantities". Yet it is clear in Texas that when construction is to be given to the word "produced" where no modifiers are used to aid in the

construction of the condition, the word "produced" nevertheless means "produced in paying quantities". Garcia v. King, 139 Tex. 578, 164 S.W.2d 509 (1942); Gulf Oil Corp. v. Reid, supra.

The Supreme Court, in the Garcia v. King case, supra, had this to say in regard to interpreting the language of a contract:

"In order to understand and properly interpret the language used by the parties we must consider *the objects and purposes intended to be accomplished by them* in entering into the contract." (Emphasis supplied)

When we look at the last sentence in paragraph number eight of the lease we find some expression and effect of the "objects and purposes intended to be accomplished" by the parties in the wording in one of the covenants of the lease:

"8. * * * After discovery of oil, gas or other mineral in *paying quantities* on said premises, lessee shall reasonably develop the acreage covered hereby *by drilling* any wells that a reasonably prudent operator would drill." (Emphasis supplied)

This is the first time "paying quantities" is used in this lease. Yet the parties concede that the use of the word "produced" as a condition in the habendum clause, means "produced in paying quantities". The covenant in this lease gives effect to that concession. The second part of this covenant (paragraph number eight above) requires lessee to reasonably develop the acreage covered herein by drilling (and drilling is later defined to include any reworking operations or attempting to bring wells back on production) any wells that a reasonably prudent operator would drill. This covenant gives clarity to the parties' intention that the use of the word "operations" as a condition in the habendum clause means "development operations".

Paragraph number four of the subject lease further clarifies the objects and purposes intended to be accomplished. It is as follows:

"4. If at the expiration of the primary term, oil, gas or other mineral is not being produced on said land but Lessee is engaged in drilling or *reworking operations* in the bore of a well thereon or shall have completed a dry hole thereon within sixty (60) days prior to the end of the primary term, the Lease shall remain in force so long as *operations* on said well or for the drilling or reworking in the bore of any additional well are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other minerals, so long thereafter as oil, gas or other mineral is produced from said land."

This paragraph restricts, defines and limits the word "operations" to: (1) "reworking operations in the bore of the well" when lessee is so engaged at the expiration of the term; and (2) upon the completion of a dry hole "within (60) sixty days prior to the end of the primary term, the Lease shall remain in force so long as operations on said well * * * are prosecuted". See Geier-Jackson, Inc. v. James, D.C., 160 F.Supp. 524 (1958).

This lease as a whole clearly sets out that the obligation and purpose of operations was the development of the land covered thereby.

Lab assigns as one of its propositions that the trial court erred in finding that the clause "or operations are conducted on the land covered hereby" as used in paragraph number two of the habendum clause is not ambiguous. First, the clause is not ambiguous and, second, the trial court concluded and found that even if such clause is ambiguous the parties to the subject lease did not intend that the "operations", as that term is used in said clause, would include the acts of Lab which they claim extends the term of the lease.

Ambiguity of a contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which of two or more meanings is the proper meaning. Universal C. I. T. Credit Corp. v. Daniel, supra; citing with approval Roxana Petroleum Corp. v. Jarvis, 127 Kan. 365, 273 P. 661, 665 (1929); Barker v. Lashbrook, 128 Kan. 595, 279 P. 12, 13 (1929). If, after applying established rules of interpretation to the contract, the phrase in the lease remains reasonably susceptible to more than one meaning, it is ambiguous, but if the phrase only contains language of doubtful meaning, the primary concern of the courts is to ascertain and to give effect to the true intention of the parties. But here, as we have seen, the use of the term "operations" means development of the lease for profit to the parties by actual drilling of new wells or repair or reworking of old wells and the attendant labors and techniques employed by the oil industry in such matters. Therefore, the trial court correctly ruled that the term "operations" was neither ambiguous nor clouded by ascribed incidents of doubtful application. The insistent contention of Lab that the expression "operations are conducted on the land covered hereby" is still ambiguous when tested by the ordinary rules applicable, impliedly invites us to invoke the stronger rule of strict construction against the party preparing the contract. This rule is applicable only where such meaning does not come clear by ordinary rules of construction. The author of the lease was the attorney for J. W. Thomas, the original lessee and the assignor of Lab.

In using the term "operations" the lessee did not have in mind any ambiguity in the use of such term, or he would have invoked the claimed examples of its meaning by detailed description as was done in defining the word "drill" in paragraph number ten of the lease, which reads as follows:

"10. Lessee shall have the use of the pipe and equipment presently located on any abandoned well on any of said land for use in his operations hereunder and wherever the word 'drill' is used in this Lease the same shall include any reworking operations which Lessee may desire to make on any presently located well on said land and the reworking or attempting to bring such wells back on production shall in all things be deemed as if drilling were being conducted as provided for herein".

The meaning of the word "operations" in drafting the lease, unquestionably denoted to the parties the meaning of doing those things that would continue the quest for production. By developing the property, the continuance of the lease would naturally follow until production be obtained or abandonment be indicated. A further discussion of the stronger rule of strict construction against the author is unnecessary.

Lab further contended that the lease contract and the parties themselves contemplated that the restoration of gas to the lessor's house (Bentz) was either a purpose, an object, an obligation or a consideration for the lease. Lab insists that the only operations which could reasonably have been contemplated were operations resulting in production to Bentz house, although Lab testified in connection with this gas furnished to Bentz, the total amount, if sold through the pipeline, would not have brought in a dollar to Lab in a year. The lease provided in paragraph number eleven that:

"11. Lessee shall attempt to restore gas for use by Lessor for domestic purposes at no cost to Lessor."

This covenant does not say that this is a purpose or object of the lease vital to its continuance. What was the purpose of the parties in executing this lease? Most certainly it was for the development of the property and not the non-profitable production to the house of Bentz in order to ex-

tend the term of the lease or to hold it merely for speculation. Clifton v. Koontz, 160 Tex. 82, 325 S.W.2d 684, 79 A.L.R.2d 774 (1959). What did the parties agree upon that might extend the lease beyond its primary term? There were two such contingencies so agreed. One was production in paying quantities (either potentially as in a shut-in well, or actual marketable production), never attained and so admitted by all parties. The other contingency that would toll the termination was the conduct of "operations" upon the leasehold. Operations for what?—The purpose or object of making a regulatory report to the Railroad Commission of Texas? This we think was a mere incident required in the industry. Was the purpose to continuously allow a small quantity of gas to flow to a residence in a pipe installed, maintained and paid for by the lessors? Such argument appears ingenuous but it was certainly not persuasive to either the trial court nor to us. The primary purpose of the subject lease, and the object of the parties, was to develop the leasehold lands with new wells or cleaning out and reworking old wells and to achieve, ultimately, production in paying quantities.

Lab, in two propositions, contends that there was no evidence or, in the alternative, that there was insufficient evidence to support the trial court's finding that Bentz did by their own effort take and use gas from the leased premises. A Mr. Bowman, the managing partner of Lab, testified that Lab did not install the gas line and regulators furnishing domestic gas to the house of Bentz, nor did Lab maintain or purport to maintain the gas line or the regulators. Mrs. Bentz testified that the Bentz laid the gas line to their house, claimed ownership of it and had used it for over three years under a prior lease with different parties. We hold the evidence is sufficient to support the trial court's findings.

During the course of the trial, counsel for Lab addressed this question to Mrs. Bentz: "Now, I will ask you if you have, or ever have had an understanding of what the word 'operations' meant?"

The trial judge sustained the objection to this question but heard the testimony on a bill of exception. Lab complains because the trial court excluded the testimony and further because Lab contends that the trial court considered the testimony in making one of its findings. These points are without merit. First the question inquired of the witness' understanding, past or present, of the meaning of the word "operations". The question was not directed to the witness' specific understanding of the meaning to be given to the habendum phrase "operations are conducted on the land covered hereby". Rather the question was directed to the witness as how the word might be defined. The question was not directed to the witness as to what Bentz intended by the use of the word "operations" in the habendum clause of the lease. The Supreme Court in Guardian Trust Co. v. Baueriesen, 132 Tex. 396, 121 S.W.2d 579 (1938) said:

"It is proper to consider parol testimony as to the circumstances surrounding the parties out of which the contracts grew, not to add to or vary their terms, but to apply the contracts to the subjects with which they deal for the purpose of ascertaining the real intention of the parties."

If the question is not directed to ascertaining the real intention of the parties, then the written contract must be taken as expressing the final views of the parties.

In the case of Guarantee Life Ins. Co. v. Davidson, (Tex.Com.App. opinion adopted, 1921), 234 S.W. 883, the court states:

"A contract which has been reduced to writing, and imports on its face a complete expression of the whole agreement, without any uncertainty or ambiguity as to the object and extent of the engagement, must be taken as

852

expressing the final views of the par-
ties, as well as the full consummation
of their undertaking."

The final views of the parties, thus reduced
to writing, preserve the sanctity of con-
tract and insure at once against the in-
security of memory and the design of bad
faith.   See also Hubacek v. Ennis State
Bank, 159 Tex. 166, 317 S.W.2d 30 (1958),
and Natural Gas Distributing Corporation
v. Williams, 355 S.W.2d 194 (Tex.Civ.App.
1962, writ ref. n. r. e)

The trial court found additionally that
even if the lease was ambiguous, under
all the evidence admitted and offered, the
parties to such lease did not intend that
"operations", as that term is used in such
clause, would include the acts of Lab.   The
evidence was offered by Lab, who excepted
to the court's not considering it at the time
of the offer, so how can Lab now object,
if the court may have stated in his conclu-
sion that upon considering all the evidence
admitted and offered, the court considered
such evidence in one of his conclusions.
If the trial court did consider the evidence,
it was harmless.   Lab has the burden to
show that the rejection of the proferred
testimony was error and that it was rea-
sonably calculated to cause and probably
did cause rendition of an improper judg-
ment.   This, they did not do.   Texas Rules
of Civil Procedure, rule 434;  Gordon v.
Aetna Casualty & Surety Co., 351 S.W.2d
602 (Tex.Civ.App.1961, writ ref.).

After reviewing all of the points pre-
sented by appellant Lab and finding no re-
versible error, the judgment of the trial
court is affirmed.

Affirmed.

GREEN, Chief Justice, and SHARPE,
Justice.

We concur in the affirmance.   We find
that the record is sufficient to sustain the
trial court findings of fact and conclusions
of law upon which the judgment is based.