**Dr. Nelson W. HAAS, Appellant,**

v.

**Cecil EARLEY, Appellee.**

**No. 460.**

Court of Civil Appeals of Texas.

Corpus Christi.

June 30, 1969.

Rehearing Denied July 31, 1969.

Carter, Stiernberg, Skaggs & Koppel, Gordon L. Briscoe, Harlingen, for appellant.

Hester & Toscano, Darrell B. Hester, Harlingen, for appellee.

OPINION

GREEN, Chief Justice.

Appellee Cecil Earley sued appellant Dr. Nelson W. Haas under the Texas Declaratory Judgment Act to recover the proceeds paid by others for a lease of the cotton allotment for the crop years 1966, 1967, and 1968 on the farm cash-rented for grazing purposes to appellee as tenant by appellant as owner and landlord. By cross-action appellant sought the same relief as against

appellee. A trial was had before the court without a jury, and judgment was rendered favorable to appellee. This appeal is from such judgment. The record contains no findings of fact or conclusions of law.

The evidence establishes that during the latter part of the Summer 1964, appellee had lost his grazing lease on which he had been pasturing about 150 head of cattle, and needed to locate land for a new lease. He was no farmer, had no farming equipment, and was interested solely in grass land for his cattle. He approached appellant for the purpose of securing a lease of appellant's land. On September 11, 1964, appellant as landlord and appellee as tenant entered into the lease contract involved in this litigation, styled a "Cash Farm Lease," which covered approximately 310 acres of land in Cameron County, Texas, owned by appellant. The consideration to be paid by appellee was $3,000.00 per year. The contract was on a form furnished by the Farm Home Administration of the U. S. Department of Agriculture, and was completed by appellant's attorney and signed by appellant and appellee.

A portion of the farm had been cultivated by tenants of appellant, and as the result of one tenant failing to properly protect the cotton allotment, the Cameron County Agricultural Stabilization and Conservation Service Committee (hereafter referred to as A.S.C.S.), which administered the federal cotton allotment program in Cameron County, had penalized appellant by reducing the cotton allotment on the land described in the lease from its 1964 level of approximately 102.9 acres to 84.1 acres. Hence appellant was anxious that this allotment be kept intact while appellee had the land under lease for grazing purposes. Accordingly, the following clauses were written into the contract:

"B.1. USE OF LAND

All leased land to be used for grazing cattle, except that portion, if any, necessary for planting of cotton to preserve *Landlord's* * cotton allotment."

and

"F.2. Government programs.—The farm will be operated in compliance with Government programs as follows: Tenant agrees to protect *Landlord's* * cotton allotment and do whatever is necessary to preserve same."

The lease was for a period of five years, with a provision for an option for an additional five years. We are not concerned with, or passing upon the validity of, the option provision. The first year's cash lease payment of $3,000.00 was waived by landlord as compensation for improvements to be made on the land by tenant, such as interior fences and cross-fences, corrals, cattle pens, feed sheds, etc. needed for the pasturage, grass-feeding, and handling of appellee's cattle.

Before the execution of the lease contract in September 1964, Dr. Haas had farmed this 310 acres as three separate farms with different tenants. In order to reconstitute the land into one farm on the records of A.S.C.S., appellant and appellee in January 1965, executed certain forms in A.S.C.S. office naming appellant as "Owner" and appellee as "Operator". An operator is defined in the federal regulations (29 Fed.Reg. 13370, Sec. 719.2) as a "Person who is in general control of the farming operations during the program year." An owner is a "Person who has legal ownership of farmland."

Under the appropriate federal laws and regulations in effect on September 11, 1964, the cotton allotment on the land could be protected in two ways: (1) by annually releasing the allotment to *A.S.C.S.,* which could then reassign it to other farmers in the county, or (2) by planting cotton on the land. Appellee testified that it was not his desire or intention to plant any cotton on the land if the landlord's allotment could otherwise be legally protected. For

* Emphasis added

the crop year 1965, appellee executed a release of the allotment to A.S.C.S. Since it was necessary that landlord join in the release, appellant did likewise. Once every third year, which in this instance turned out to be in 1966, it was necessary to plant some cotton in order to preserve the allotment, although as to this lease only one-tenth of an acre had to be so planted. But such planting became unnecessary because of a new law dealing with cotton allotments which will now be discussed, and which gave rise to the controversy in this suit.

Prior to 1965, a cotton allotment was considered to be no more than a regulatory device of national farm policy used to limit the supply cotton in order to raise prices and to allocate to the individual land owner a share of the national crop or market and certain federal benefits provided by law to cotton growers. A cotton allotment was not property to be bought, sold, or leased, separate and apart from the land. Agricultural Allotments as Property, 79 Harvard Law Review 1182 (1966); Cotton Allotments: Another New Property, 45 Tex.Law Review 734 (1967). However, in 1965 to become effective with the crop year 1966, Congress enacted legislation which, for the first time, authorized the transfer of cotton allotments by sale or lease from one individual to another, separate and apart from the underlying land. Food and Agriculture Act of 1965, § 405, 79 Stat. 1197, 7 U.S.C. § 1344b (Supp.1965). See the two law review articles cited supra. As a consequence of this legislation, a cotton allotment became a new and valuable type of intangible property.

As a result of the 1965 legislation, the cotton allotment on this 310 acre tract for the crop years 1966, 1967 and 1968 had taken on a new value, since it could now be sold or leased apart from the land to farmers in the county who wished to farm cotton. Each party to the lease contract here involved claimed to have the right to lease the allotment and to keep as

his own the cash proceeds of the lease. Appellant attempted in a hearing before the members of the A.S.C.S. committee to have his name substituted for appellee's on their records as operator of the farm, but failed. Under the law, it was necessary for both operator and owner to sign any transfer. After some negotiations, appellant and appellee jointly signed, on December 29, 1965, a lease or transfer of the cotton allotment on the land in question for the crop year 1966 *"under protest,"* with each party receiving one-half of the consideration of $1,160.00, without prejudice to the right of either party to seek judgment against the other for the sum ($580.-00) received as the other's disputed portion. Thereafter, by agreement of the parties and their lawyers, the allotments for 1967 and 1968 were leased pursuant to transfers executed by both parties, and the proceeds placed in escrow pending the outcome of this litigation.

Appellant presents his case on appeal by the following Point of Error No. One:

> "The trial court erred in holding that Appellee is the owner of the proceeds of any lease of the cotton allotment in question, and further erred in failing to declare Appellant the owner of the cotton allotment in question and the person entitled to the proceeds of any leases of same."

We sustain this point of error, and reverse and render the judgment.

As heretofore shown, the lease contract expressly provided that all of the leased land was to be used by tenant for grazing of cattle except that portion, if any, *necessary* to preserve *landlord's* cotton allotment; and the tenant agreed to do whatever *was necessary* to preserve *landlord's* allotment. Appellee testified that these provisions were placed in the lease for landlord's benefit, and that when the contract was signed, it appeared that this actually was a burden on tenant. His testimony shows that at that time he was not interested in the cotton allotment for any purpose except to

perform his contractual obligations. Both appellant and appellee expressly treated and considered this as "Landlord's allotment." It clearly was not within the contemplation of either party that appellee would receive any money or make a profit in dealing with appellant's cotton allotment.

The fact that both "Owner" and "Operator" had to sign the transfer had no effect on the ownership of any rights in the cotton allotment, particularly since the operator's only interest in the land was pasturage for his cattle. Although as between these parties and the A.S.C.S. the appellee was named as the person in general control of the farming operations, *the rights as between appellee and appellant were fixed by their lease contract.* The designation of appellee as "operator" related only to "control" of farming operations in the various dealings with the agencies of the federal government for the program year. *It did not create property rights.* The office manager of A.S.C.S. who testified on behalf of appellee stated that he was not acquainted with the terms of the lease, had not read the contract, and was not considering the provisions of the lease contract in giving his testimony. He was, as we understand his evidence, concerned with the many and various regulations of the U. S. Department of Agriculture as between the A.S.C.S. and these parties.

Under the undisputed evidence discussed above and what we consider to be the proper construction of the lease contract and other documents mentioned, we hold that the proceeds of the leases of the cotton allotment to others for 1966, 1967 and 1968 belonged to appellant Haas, and that he is entitled to judgment for same.

The judgment of the trial court is reversed. Judgment is here rendered that appellant Dr. Nelson W. Haas is the owner of the cotton allotment on the land here involved, and is entitled to the proceeds of the leases thereof. Appellant shall recover from appellee the sum of $580.00 with interest at 6% per annum from January 7, 1966, being the date of payment to appellee under protest of one-half of the proceeds of the lease of the 1966 allotment, and judgment is rendered that appellant Haas is entitled to receive all monies heretofore placed in escrow as the consideration received from the lease of the 1967 and 1968 cotton allotments on this land, and any sums, if any, which may have subsequently been paid during the pendency of this appeal. Costs are assessed against appellee.

Reversed and rendered.

NYE, Justice (dissenting).

I respectfully dissent. This is a suit to construe a lease contract. Dr. Nelson W. Haas leased 310 acres of farm land to Cecil Earley on a cash rental basis. The contract was drawn on a U. S. Government form with the blank spaces and special provisions typed in and supplied by the doctor's own attorney. During the second year of the lease a change in governmental regulations covering the use of the cotton allotment caused a dispute to arise between the parties to this contract. The lessee Earley brought a declaratory judgment action for a construction of the terms of the lease. The trial was before the court sitting without a jury. After a rather lengthy trial the court ruled in favor of the lessee Earley. The lessor, Dr. Haas, has perfected his appeal without the aid of any findings of fact or conclusions of law. The case must be determined on two general principles: (1) whether or not the rights of the parties can be determined as a matter of law from the contract itself, or (2) whether or not the evidence contained in the statement of facts supports the trial court's judgment on any theory.

There are certain fundamental rules that must be followed if a contract is not clear. If there is no ambiguity in the written contract its construction becomes a question of law. On the other hand, if the contract is ambiguous, evidence is authorized to determine the intent of the parties. All conflicts in the evidence are determinable by the court sitting without the aid of

a jury. There are many other guide lines in contract construction, but the final criteria is to determine the true intent of the parties. See Lab Oil Company v. Bentz, 380 S.W.2d 846 (Tex.Civ.App.—Corpus Christi 1964). To do this we shall read and consider the entire instrument from its four corners, considering each clause and paragraph with reference to other paragraphs so that the effect of one to the other may be clearly determined, and finally to place such construction on the agreement that will give effect to all of its provisions. Benge v. Scharbauer, 152 Tex. 447, 259 S.W.2d 166 (1953). Ambiguity of a contract does not appear then, until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which of two or more meanings is the proper construction. Universal C. I. T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154 (1951). Then, after that, oral testimony will be received.

The lessee Earley was desirous of obtaining land to raise cattle having lost his previous lease. The lessor, Dr. Haas, was desirous of obtaining a good tenant, after having had bad experience with previous tenants who left his land in a roughened condition with weeds and Johnson grass and causing him to lose a portion of his cotton allotment. Dr. Haas entered into a hybrid type lease agreement, primarily because his land was a farm and not a ranch. In order for the lessee to continue his cattle operation he had to borrow some $38,000.00 to $39,000.00 from FHA to finance his operation. Therefore, the terms of the lease had to be approved by a number of parties. Involved in Dr. Haas' previous farming operations, were certain necessary dealings with government farm programs. Included were the grain subsidies and the cotton program. The lessee was primarily interested in the grain program because he could be paid money from the Federal government for not raising grain and by complying with the government program. The doctor was interested in the cotton program since he did not want to lose any more of his cotton allotment that was assigned to his farm. With this background, we turn to the provisions of the lease.

The lease was prepared on a four page printed form supplied by the U. S. Department of Agriculture and was called "Cash Farm Lease". It named Haas as "landlord" and Earley as "tenant". The employment of these terms and other provisions in the lease would imply something more than a ranching operation. Under paragraghp A. "PROPERTY RIGHTS", the lease provided that:

"The landlord hereby leases to the tenant, *to occupy and use for agricultural and related purposes,* the following-described property, hereinafter referred to as the *'farm',* located in Cameron County, State of Texas, and commonly know as the Haas Farm: * * * subject to reservation by Landlord of enough property for a home place and right to construct dams and plant shade trees and consisting of 310 acres, more or less, *together with all* buildings and improvements thereon and *all rights thereto except as specified below."* (emphasis supplied)

The lease then provides, among other things that:

" * * * If the landlord should sell or otherwise transfer title to the farm, he will do so subject to the provisions of this lease."

The lease provided for the tenant to construct fences and corrals and feed sheds which were to be repurchased by the landlord. Under paragraph B.1 Land Use and Livestock Production table there is typewritten into the lease the following sentence:

"USE OF LAND—All leased land to be used for grazing of cattle, except that portion, if any, necessary for planting of cotton to preserve Landlord's cotton allotment."

The lease then provided that:

> "* * * the tenant will operate the farm in an efficient and husbandlike way, will do the plowing, seeding, cultivating, and harvesting in a manner that will conserve the landlord's property."

The tenant was prohibited from plowing permanent pasture or meadowland, burn or remove corn stalks, corn cobs, straw, or other crop residues without the permission of the landlord. The cost of weed control was to be paid by the tenant. The landlord agreed to pay for the seed for the "planting of rye grass one time only," with the tenant being required "to pay all expenses of planting and care. Landlord to furnish no other Material." The lease then provides in a typewritten portion that:

> "Tenant is permitted any practice desired by him provided it is solely at Tenant's expense and no part thereof to be paid by the Landlord."

Again the lease provided for preparing or re-seeding the land which gave the tenant considerable leeway so long as no expense was chargeable against the landlord. Under the heading of "straight cash rent" the lease stated that the tenant would pay $3,000.00 per year with the first year's rent free to compensate for the improvements on the land. The lease provided for a five-year term with a five-year option and gave the tenant ninety days to remove his stock from the premises. Then the most important clause under paragraph F.2. the agreement stated:

> "Government programs.—the farm will be operated in compliance with Government programs as follows: *Tenant agrees to protect Landlord's cotton allotment and do whatever is necessary to preserve same.*" (emphasis supplied)

Under existing federal law at the time the lease was executed the lessee could protect the cotton allotment either by one of two methods: (1) by annually releasing the allotment to the County committee for it to be assigned to other farms in the coun-

ty; or (2) by planting the cotton on the tenant's farm. Subsequently Congress made a change in the regulations which provided that the cotton allotment could be protected further by a third method: i. e., by leasing out the allotment to another farmer on a farm within the county. As the facts developed in this case the lessee attempted to lease out the cotton allotment to another farmer at a profit, whereupon the landlord lessor stopped him, contending that the privilege of leasing out this cotton allotment belonged to him along with any profit therefrom.

Generally speaking, everything which belongs to the demised premises or is used with, and appurtenant to, the demised premises and which is reasonably essential to its enjoyment, passes as an incident to such lease, unless specifically reserved. 51C C.J.S. Landlord & Tenant § 293, p. 745, and authorities cited therein. This would include proceeds from Federal conservation program paid to the tenant. 52 C.J.S. Landlord & Tenant § 803, p. 729. The landlord's attorney who prepared the lease knew how to except and reserve from such lease those matters intended to be excepted and reserved. (i. e., homeplace, dams, shade trees, and land for such). The landlord knew also how to specifically require the lessee to perform certain covenants as is evident by his typewritten condition requiring the tenant to do whatever was necessary to protect the landlord's cotton allotment. I would hold that this incorporeal right and obligation is covered by the contract itself, and that by giving effect to the language contained within the four corners of the lease, the parties themselves determined by their agreement that the use of the cotton allotment belonged to the lessee. The intent of the parties was that the lessee was to use the cotton allotment and to return it to the landlord intact at the end of the lease.

Contrary to appellant's contention in his point of error, the trial court did not hold, nor does appellee contend that the ownership of the cotton allotment is in any

other person other than the landowner. Appellant argues throughout his brief that under certain undisputed facts he is entitled to the proceeds from the allotment. He argues that the cotton allotment is a property right that he alone owns and controls; that it is such a right than can be capitalized by authority of the Internal Revenue Code; that when Dr. Haas made the lessee the "operator" of the farm, it was a unilateral mistake on his part without consideration; and that all in all, the money received for leasing out the cotton allotment is a windfall to which the lessee should not be entitled. I agree that by taking certain selected facts from the evidence and by giving them a prejudicial meaning, it could be determined that the parties intended for the landowner to retain the cotton allotment. However, the question before this appellate court in this case, under its present posture is, that in order to obtain a reversal in this non-jury case where the record contains a statement of facts but no findings of fact or conclusions of law, the appellant must show from the record that under no theory to be gathered therefrom, was the court authorized to render judgment, and the judgment must be affirmed if the statement of facts supports it on any theory of the case. 3 Tex.Jur.2d, § 438, p. 689 and Rosales v. Rosales, 377 S.W.2d 661 (Tex.Civ.App.–Corpus Christi 1964).

The statement of facts covers 279 pages with more than ten exhibits. There are several theories from the evidence that would authorize the affirmation of the trial court's judgment. For determining the correctness of the trial court's judgment in such a situation where no findings of fact or conclusions of law were requested or filed by the trial judge, the judgment itself implies all necessary fact findings in support of its judgment.

"In seeking to determine whether there is any evidence to support the judgment and the implied findings of fact incident thereto 'it is proper to consider only that evidence most favorable to the issue and to disregard entirely that which is opposed to it or contradictory in its nature.'" Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609, 23 A.L.R.2d 1114 (1950).

One such theory that requires an affirmance of the trial court's judgment came from the testimony of a disinterested witness under subpoena, who was manager for the Cameron County Agricultural Stabilization and Conservation Service, Mr. Aldon Gilliland. He was familiar with the dispute between the parties since the parties had previously gone to the County Committee for a determination of their rights. This arose in the following manner. The landlord voluntarily designated the tenant as "operator" of the farm. Under federal regulations operator was defined as "The person who is in general control of the farming operations on the farm during the program year." In designating Earley as operator, Haas changed operators from Juan Machuca to Cecil Earley. The form which he signed stated in part that Earley would "have managerial control of all the lands and crops on this farm in 5 (years of lease)." At the bottom of the form he certified that the statement was true to the best of his knowledge and in no way has this change (of operators) taken place *to defeat the purpose of the allotment program.* (emphasis supplied).

The Federal Government during the second year of the lease made an additional provision whereby the tenant could "protect landlord's cotton allotment." In the testimony of Mr. Gilliland's he stated that there were two means available to the appellee in the first year of his lease, and three means available to the lessee in the second and following years. This was his testimony:

"Q. All right. Then, if I understand you correctly, Mr. Gilliland, Mr. Earley in 1965 did what was necessary to protect the allotment on the farm: He released it back to the County Committee. Is that correct.?

A. Yes, sir. He could have planted it, but he chose to release it.

Q. All right. Now, if he had not planted it and he had not released it, either one, what would have happened to the allotment under the law and regulation?

A. Well, if he hadn't planted it or hadn't leased it, he would have lost 50 percent of the allotment.

Q. All right. And he, and he alone, Mr. Earley was the only one who could either plant or release it at that time?

A. Yes, sir.

Q. Now, the following year the law changed?

A. In 1966, yes, sir.

Q. And for the first time provided what, Mr. Gilliland?

A. Well, we had a provision in the law in your Agricultural Act of 1965 that provided that cotton could be released, sold or transferred. It could be leased for one year or for four years at that time through 1969.

Q. Now, were the other provisions of protecting allotments still retained? That is, could the operator release it back to the Committee or plant all or a part of it to protect the allotment?

A. Yes, sir.

Q. Then, if I understand you, this was a new option that was added as another way in which an allotment could be protected. Is that what you're telling us?

A. Yes, sir.

Q. Of course, if the allotment were actually sold, that would not protect the allotment would it?

A. No, sir, because that would be gone from the farm permanently then."

\* \* \* \* \* \*

"Q. Then, if I understand you, Mr. Gilliland, beginning in 1966, if a man has to do whatever is necessary to protect an allotment, he can do one of three things: He can plant it, he can release it back to the County Committee, or he can lease it to somebody else, and any one of those three ways will protect the allotment on that farm, is that correct?"

A. Yes, sir."

Mr. Gilliland also testified that the landlord attempted to change operators and thereby take over the control of the use of the allotment. In this connection the appellant was referred to the ASCS County Committee where he tried to obtain a ruling that would permit him the right to deal with the allotment. This committee is made up of volunteer farmers within the community who are elected by other farmers. The minutes of that meeting which was introduced into evidence and signed by the Chairman, Vice Chairman and a member, stated as follows:

"Dr. Haas and Cecil Early and his lawyer met with the committee with reference to farm D–4526. Mr. Early still has the land rented but Dr. Haas wants to be shown as the farm operator. After discussing this thoroughly and reviewing the five year lease agreement Dr. Haas' request to change operators from Cecil Early to himself was disapproved. These people understood this when they left the meeting."

The appellant made no attempt to exhaust his further administrative remedy by appealing to the County Appeals Committee as provided by Federal regulation. Although appellant is complaining of appellee's "Windfall" the lease provided that the lessee must protect the landlord's cotton allotment. This the lessee was doing at a

profit. But the real windfall will come to the landowner at the end of the lease when he may sell his cotton allotment. The testimony reveals that this allotment could be worth as much as the land itself. Along with this same connection, the testimony was further developed that for four years prior to entering into the "cash farm lease" with this appellee, the doctor had never received from his prior farming (including cotton) in any one year, as much as one half of the $3,000.00 cash rent appellee is now paying under the lease.

In the present posture of this case we are required to do what the appellate courts have done many times before, and that is that we must assume that the trial court found every issuable fact in support of the judgment. While determining the sufficiency of the evidence to support the implied findings of the trial court we must apply the rule that if, discarding all adverse evidence and giving credit to all evidence favorable to the successful party, and indulging every legitimate conclusion favorable to him which might have been drawn from the facts proved, the trier of the facts might have found in his favor, then it is to be concluded that there is evidence to support the findings. Every reasonable intentment must be resolved in favor of the trial court's judgment and it will be affirmed if there is any evidence to support it upon any theory authorized by law. Banks v. Collins, 152 Tex. 265, 257 S.W.2d 97 (1953); James v. Drye, 159 Tex. 321, 320 S.W.2d 319 (1959); and see National Military Mutual Life Insurance Company v. Cross, 379 S.W.2d 96 (Tex.Civ. App.–Corpus Christi 1964) Oxford Development Co. v. Eppes, 422 S.W.2d 583 (Tex. Civ.App.–Corpus Christi 1967); Drexler v. Architectural & Commercial Sales, 375 S.W.2d 550 (Tex.Civ.App.–Corpus Christi, 1964).

With these rules in mind certain selected testimony from the statement of facts reveals additionally the intent of the parties which would further authorize affirmance of the trial court's judgment. It was undisputed that the lessee received the grain allotment. The provisions under the lease are not nearly as clear in their application relative to the grain program, as that of the cotton allotment. The evidence was that under this grain program, the lessee received $631.00 a year more or less. The lessor voiced no objection to lessee receiving money from the U. S. Government grain program.

The lessee testified that it was his intent to have the cotton allotment, and although he could not sell the allotment he had the right and obligation to use it. In this connection he testified that he paid $3,000.00 for the total farm.

Mr. Gilliland testified that this new Federal regulation was a new option given to the lessee in which the cotton allotment could be protected. The provisions of the Federal regulations required both the operator and the landowner to execute a lease or sale of the allotment. Obviously this was for the protection of both the landlord and the tenant. The landlord could not sell the allotment as long as the operator had the right to use it, and the tenant could not lease it out for a longer period of time than the term of his lease. It is therefore reasonable to presume that although the lessee was obligated to protect the allotment (this seemed to be a burden on him at the time he entered into the lease), it could have become even a more of a burden by different Federal regulations requiring the lessee to do additional things to protect the allotment. Therefore, it is a legitimate conclusion that may be drawn from these facts, that the opposite could be true where the Government regulations permitted the lessee to use the allotment to his advantage.

Finally, Mr. Gilliland testified that only Cecil Earley was entitled to the use of the cotton allotment and grain base on the farm. He stated:

"Under our definition of an operator, Mr. Earley is in control of the land on this farm. He is in day-to-day control of it, and he is responsible for the cotton

allotment or the grain base and the only —There's nobody else listed. There's nobody else interested in this farm because Dr. Haas has put 'None' where it says, 'list other persons who will have an interest in this farm.'"

Although we accept as true all evidence of the successful party which tends to support the trial court's judgment and give the benefit of every reasonable inference that can be drawn in favor of his position, in summation there are many facts in the record that can be said are true without contradiction:

1. Appellant-landlord, through his own attorney, prepared the lease in question.

2. Appellant as landlord did not reserve to himself in the lease any rights of use or disposition of the cotton allotment assigned to the leased premises during the term of the lease, nor did he reserve to himself any right to deal with the cotton allotment in any manner during the term of the lease.

3. The appellee as tenant of this "farm" under the terms of the lease was given the right and power "to do whatever is necessary" to protect the cotton allotment during the term of the lease.

4. At the time the lease was executed the appellee had two options open to him in the protection of the cotton allotment: (1) he could release the allotment back to the Cameron County Committee for them to re-allocate to other farms in Cameron County, Texas, or (2) he could plant all or any part of the cotton allotment on the leased premises.

5. During the second year of the lease, a third option of protecting the cotton allotment was provided by Federal law, to-wit: the allotment could be leased out to another farmer to use on another farm during the crop year. (The new Federal provision also provided that the allotment could be permanently sold but this would not be a method of protecting the cotton allotment to the leased premises since it would be a permanent deprivation of the allotment to the premises).

6. By reason of the lease, the appellee was the "operator" of the leased premises both by designation of the County Committee and by definition of the Secretary of Agriculture, as such definition is published in the Federal Register. Even appellant designated appellee as "operator" when he filed "changes of operator" with the A.S.C.S.

7. In 1966, the appellant-landlord attempted to seek a ruling of the Cameron County Agricultural Committee under the Agricultural Conservation and Stabilization program, to allow him as landlord to deal with and sell the allotment. His request was denied and he made no appeal from such ruling as provided by Federal rules and regulations to a County Review Committee.

8. Appellee leased the cotton allotment for the farm year 1966 but because the signature of the owner of the farm was required on the allotment lease form, appellee had to pay appellant one half of the proceeds to get his signature, which payment was made under protest. It was for this amount that appellee was given a money judgment against appellant.

9. In subsequent years, the cotton allotment has been leased with both appellee and appellant signing the lease papers under an agreement placing the monies in escrow subject to the judgment in this action.

10. Appellee has paid all rents as they became due under the lease and there is no question that the lease is valid and in force; and finally

11. The granting clause of the lease provided that "the *landlord* hereby *leases to the tenant*, to occupy and *use for agricultural* and related *purposes*; * * * the 'farm' * * * consisting of 310 acres, more or less, *together* with * * * *all rights* thereto except as specified below." The cotton allotment was not excepted out or

"specified below" in the lease. (emphasis supplied).

Under the heading "use of land" lessee was permitted, and could use that portion of the farm "necessary for planting of cotton to preserve landlord's cotton allotment." Without this right to use the cotton allotment, it would have been impossible for lessee to have legally planted cotton.

Finally, lessee was required to do whatever is necessary to preserve the cotton allotment. "Whatever" is all inclusive, especially where nowhere in the lease was such use restricted.

I would affirm the judgment of the trial court.