John H. THOMAS and Oliver N. Kilgore

v.

The COUNTY OFFICE COMMITTEE OF CAMERON COUNTY and the County Office Committee of Willacy County, Texas.

Civ. A. No. 71–B–23.

United States District Court,
S. D. Texas,
Brownsville Division.
April 30, 1971.

**1246**

Thomas Sharpe, Jr., Brownsville, Tex., for plaintiffs.

Anthony J. P. Farris, U. S. Atty., William L. Bowers, and Charles Wolfe, Asst. U. S. Attys., Houston, Tex., for defendants.

## MEMORANDUM AND ORDER

NOEL, District Judge.

In order to expedite the disposition of this cause and to meet the natural propensities of the Texas Rio Grande Valley growing season, the Court announced its ruling in this cause from the bench on March 24, 1971. At that time the Court informed the litigants that it would reduce its oral pronouncement to writing.

### Background

Plaintiffs filed their original complaint on February 19, 1971, seeking to enjoin the Cameron County, Texas, Agricultural Stabilization and Conservation Committee (hereafter County Office Committee) from discharging its decisions of January 20, 1971 and February ary 1, 1971, preventing Cameron County cotton producers from transferring their cotton allotments to other producers for use in other Texas counties. In essence, plaintiffs charged that the County Office Committee had incorrectly applied the provisions of the new 1970 Agricultural Act which became effective on November 30, 1970, and that there was insufficient evidence adduced at the Committee hearings to support its decision. They admitted, however, that they had not filed individual transfer requests because they believed such requests would be frivolous in light of the County Office Committee's prior general policy statements prohibiting inter-county transfers.

The Court convened on February 25, 1971, in Brownsville, Texas. It determined that plaintiffs had failed to exhaust their administrative remedies and postponed its disposition of the case until exhaustion could be achieved. The Court preliminarily noted that exhaustion would require each plaintiff to file a written request for permission to transfer their allotments with the Cameron County Office Committee as called for in 7 U.S.C. § 1344b(b) (vii) of the Agricultural Adjustment Act of 1938, as amended in 1965 and 1968, and carried forward in the Agricultural Act of 1971 in § 601(3) (1) (a) (2) (November 30, 1970), and would require that the County Office Committee hold a hearing to determine if the necessary prerequisites for transfer as enumerated in § 601(3) (1) (a) (2) of the Agricultural Act of 1970 had been fulfilled. Namely, the County Office Committee was called upon to determine if the persons who held liens on the farms from which the allotments were sought to be transferred approved, 7 U.S.C. § 1344b(b) (iii) (1938) as amended in 1965 and 1968 and carried forward in § 601(3) (1) (a) (2) of Pub. Law 91–524 (November 30, 1970), and to determine if a *demand* for the acreage allotments sought to be transferred existed at that time in the transferor county. § 601(3) (1) (a) (2) of Pub.Law 91–524 (November 30, 1970).

On March 5, 1971, the Court entered a Memorandum and Order advising the parties of its belief that administrative exhaustion would not be completed until a party aggrieved by the decision of the County Office Committee appealed that decision administratively to a County Review Committee as provided for in 7 U.S.C. §§ 1363–1366 (1938) as amended 1951; and procedurally governed by the provisions contained in 7 C.F.R. §§ 711.1–711.27 (1970).[1]

Meanwhile the Cameron County Office Committee met March 3, 1971, to rule upon the plaintiffs' transfer requests. The County Office Committee heard numerous witnesses, examined statistical evidence and heard the arguments of counsel before it made its determination to deny plaintiffs' applications. Plaintiffs then presented their appeals to the County Review Committee on March 9, 1971. The Review Committee held a de novo hearing and affirmed the County Office Committee's decision.

On March 11, 1971, the Court again traveled to Brownsville to review the administrators' decision. At that hearing it heard the argument of counsel and took the case under advisement. On March 18, 1971, the Court entered its second Memorandum and Order in which it advised the parties that it was remanding the case to the Review Committee so that it could articulate the basic factual determinations it had made and could enumerate the legal criteria it had used. The Court also delineated the scope and meaning of the *demand* test used in § 601(3) (1) (a) (2) of the Agricultural Act of 1970.[2]

In response to the Court's mandate the Review Committee convened on March 23, 1971, in Corpus Christi, Texas. After hearing the argument of counsel

and receiving additional evidence, it reaffirmed its previous decision and enumerated its findings of fact and conclusions of law.

The Court convened in Corpus Christi, Texas, on March 23, 1971, to review the revised determinations of the Review Committee. The Court received into evidence the transcript containing the Review Committee's March 23, 1971 proceedings and determinations and heard the arguments of counsel. The Court adjourned the hearing until the next morning. On March 24, 1971, the Court reconvened the hearing, heard further argument of counsel and entered its preliminary findings of fact and conclusions of law from the bench. In substance, the Court affirmed the Review Committee's determination because it found that the agency's decision to affirm the Cameron County Office Committee decision was supported by law and substantial evidence.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

It is appropriate now to enter revised findings of fact and conclusions of law in this case. Accordingly, it is ordered that these shall replace and supersede the oral but preliminary findings of fact and conclusions of law which the Court previously made on March 24, 1971.

1. The Review Committee and this Court have jurisdiction pursuant to the provisions of the Agricultural Stabilization and Conservation Act of 1938, 7 U.S.C. §§ 1363–1366 (1938), as amended in 1951 and 1960, for the reasons previously set forth in the Memorandum and Order of this Court entered March 5, 1971, at page 1252, Appendix I.

2. The findings of fact and conclusions of law which were made by the Re-

---

1. To enhance the reader's understanding of this case the Court has attached an appendix consisting of the Court's two previous Memoranda and Orders in this cause entered March 5, 1971 and March 18, 1971.

2. As noted in footnote *1* herein, the Court's March 18, 1971 Memorandum and Order

is attached as Section 2 of the appendix.

As the reader will note, the Court was concerned with a second cause also in its March 18, 1971, Memorandum and Order. This cause was subsequently dismissed by the Court with the consent of all counsel during the Court hearing of March 23, 1971.

view Committee on March 23, 1971, are sufficient and can be reviewed by this Court. See the authorities and discussion set forth in the Court's Memorandum and Order entered March 18, 1971, at page 1255, Appendix II.

3. Although the Court is using the standards of review called for in § 1366 of Title 7 of the United States Code, it is important to note that it would be using the same standards if it were proceeding under the Federal Administrative Procedure Act, 5 U.S.C. § 706 (1946) as amended in 1966. Using the standards enumerated in either Act, the Court would reach the same decision. See: Chandler v. David, 350 F.2d 669 (5th Cir. 1965); cert. denied 382 U.S. 977, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966); Review Committee v. Willey, 275 F.2d 264, 273 (8th Cir. 1960), cert. denied 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed.2d 1522 (1960) (Review under 7 U.S.C. § 1366); Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Hayes v. Celebrezze, 311 F.2d 648 (5th Cir. 1963).

■ 4. The Court's scope of review is a limited one. The Congress has allowed the Court to determine only if the decision of the agency below—namely the Review Committee—was supported by law and substantial evidence. Furthermore, its review procedures are limited. It cannot hear the evidence de novo. Instead, the Court must make its determinations by the examination of the agency's proceedings as reflected in the transcripts of its proceedings and its findings of fact and conclusions of law. See: Jones v. Hughes, 400 F.2d 585, 590 (8th Cir. 1968); Chandler v. David, supra; Crolley v. Tatton, 249 F.2d 908, 910–912 (5th Cir. 1957); see also: Universal Camera Corp. v. N. L. R. B., supra; Hayes v. Celebrezze, supra.

■ 5. Plaintiffs had the burden of proof before the Review Committee, as they do here. See Jones v. Hughes, supra. That is, plaintiffs had the burden before this Court of demonstrating that the decision of the Review Committee be-

low was not supported by substantial evidence under application of the correct legal criteria. Id.

6. Substantial evidence exists in the record of the Review Committee, considered as a whole, if the Court finds that there is more than a scintilla of credible evidence on that record to support the decision, and if the Court finds that the decision reached by the Review Committee is reasonable. Universal Camera Corp. v. N. L. R. B., supra; Hayes v. Celebrezze, supra; Review Committee v. Willey, supra.

■ 7. It should be borne in mind that the individual cotton producers to whom the Cameron County Office Committee granted or allocated cotton allotments are not vested with *unlimited* personal property rights in such allotments. *See:* B. Parrish, Cotton Allotments: Another "New Property", 45 Tex.L.R. 734 (1967). Instead, as the Court of Appeals for the Fifth Circuit said in Allen v. David, 334 F.2d 592, 599 (5th Cir. 1964); cert. denied 379 U.S. 967, 85 S.Ct. 660, 13 L.Ed.2d 560 (1965), "There are no personal rights of property created in the plaintiffs * * *. The Agricultural Act is a public law; therefore, no vested rights may be obtained under it. The chief purpose of the Act is to control the production of certain agricultural products * * *" *Id.,* 599. There the Court was careful to caution that the aggrieved producers were free to use their allotments only in the manner conditioned by Congress in the legislation which governed the creation and granting of those allotments to cotton producers. *Id.;* Dighton v. Coffman, 178 F.Supp. 114, 115, 122 (E.D. Ill.1959); affd. 279 F.2d 497 (7th Cir. 1960).

■ The cotton producers who have been granted allotments for Cameron County production, therefore, have no vested right to possess or to transfer their allotments in a manner inconsistent with the Congressional legislation granting or conditioning their use. The producers' rights to transfer their allot-

ments out of county are specifically limited to the circumstances prescribed in § 601 of the Agricultural Act of 1970 as amending the prior Act. That is to say, they cannot transfer their allotments out of county unless the County Office Committee for their county finds as of the date of its determination that there is no longer an in-county demand for such acreage allotments. For a discussion of the scope and meaning of the term "demand" as used in § 601 of the Agricultural Act of 1970 see the Court's March 18, 1971 Memorandum and Order, at Appendix II.

■ 8. The Court believes that it is important to note the change in Congressional policy which underlies and manifested itself in the 1970 amendments to the cotton production provisions of the base Agricultural Act of 1938. The intent of the Congress was to cease the prior restrictions on cotton production, and instead to promote the production of domestic cotton by reducing the government restraints on that production. For a discussion of the 1970 Act's legislative history see the Court's March 18, 1971 Memorandum and Order, at Appendix II. For a discussion of the Congressional intent which underlay the previous regulatory statutes, see the Appellate Court's decision in Allen v. David, supra, wherein it stated, "[T]he heart of the Act (in 1964) is the elimination of excessive supplies of cotton through a detailed scheme for regulating production." Id. 601; Cf: Haas v. Earley, 443 S.W. 2d 861, 863 (Tex.Civ.App.—Corpus Christi, 1969) no writ hist.

9. As stated earlier, the Court has reviewed the findings of fact and the conclusions of law which the Review Committee entered on March 23, 1971 and is convinced that they are sufficient and correct. The Court finds and concludes that the Review Committee applied the correct law to the evidence before it and that there was substantial evidence before the Committee to support the factual determinations which it made.

■ 10. Some of the evidence which this Court finds to have been substantial will be discussed. From this evidence it was reasonable for the Review Committee to have concluded that as of March 3, 1971, the County Office Committee's determination that there was an active in-county market demand for the allotments sought to be transferred ·was correct. Some of the evidence is as follows:

During the March 9, 1971 hearing before the Review Committee the government introduced into evidence the complete record of the March 3, 1971 hearing before the Cameron County Office Committee. (See p. 52 of the March 9, 1971 hearing before the Review Committee.) At that hearing the County Office Committee had received the testimony of numerous Cameron County cotton producers as well as a stipulation that a large number of farmers would testify likewise if called.

These producers were very familiar with the Cameron County cotton production. They were asked to render their opinions as to whether there then existed an active local market for cotton allotments. All of these men testified that in their opinions such a market existed. Many of these producers also indicated that they were themselves seeking to lease or purchase additional acreage allotments to use in Cameron County. They also indicated that most of them— the vast majority of them—would be willing to pay and were bidding the going local rate and higher to acquire allotments. (See pp. 10–207 of the March 3, 1971 hearing before the Cameron County Office Committee)

Plaintiffs below were given the right to cross-examine these witnesses, but their counsel was unable to elicit any competent testimony which would indicate that an active and viable transfer market did not then exist. Id.

During the March 9, 1971 Review Committee hearing the government introduced into evidence numerous factual reports. These reports were compilations of statistics taken from the Cam-

eron County Office Committee's cotton allotment transfer and surrender records, and were of three basic types. The first reflected the number of requests for intra-county allotment transfers which the Cameron County Office Committee had received for the 1971 crop year. The second set out the results of the three previous Cameron County producer referendums in which they voted on the issue of whether to allow inter-county allotment transfers. The third enumerated the Cameron County producers previous use of surrender allotment acreage.

The Cameron County intra-county transfer records indicated that for the 1971 crop year the County Committee had received 556 written requests on the government's official forms seeking approval of in-county allotment transfers. (See pp. 58, 80 of the March 9, 1971 Review Committee's hearing). During the March 23, 1971 hearing Mr. Gilliland, the Cameron County Office Committee's Executive Director—not a voting Committee member—elaborated upon these in-county transfer requests. He pointed out that 444 of these applications had been filed between February 1, 1971 and March 1, 1971, with the greater portion having been filed in the latter part of February. (See pp. 25–26 of the March 23, 1971 Review Committee's hearing.) During the March 9, 1971 Review Committee hearing Mr. Gilliland testified that during the two-day period just before the County Office Committee made its determination to deny out-of-county transfers, that four to six applications for in-county allotment transfers had been filed. (See p. 80 of the March 9, 1971 Review Committee's hearing.)

The government placed into evidence before the Review Committee the results of the three prior producers' referendums. Under the law as it existed between 1965 and 1970, two-thirds of the in-county producers participating had to approve out-of-county allotment transfers in a referendum called for that purpose. 7 U.S.C. § 1344b (1938) as amended in 1965 and 1968; B. Parrish,

Cotton Allotments: Another "New Property", 45 Tex.L.R. 734, 738 (1967). If the county producers did not authorize inter-county transfers, then intra-county transfers were solely permissible. *Id.*

In the three Cameron County producers referendums the producers voted over two-to-one against allowing out-of-county allotment transfers. (See pp. 59–60, 85 of the March 9, 1971 Review Committee's hearings.)

During the March 9, 1971 hearings the government offered into evidence the Cameron County local and state surrender records. Under the present and past law a cotton producer who does not desire to plant or transfer his acreage allotment must surrender it to the County Office Committee by a specified date or suffer a penalty upon the size of his future allotment. The County Office Committee then reallocates the surrendered acreage to other in-county producers who file applications for it and surrenders any of the unused allotment acreage to the State Committee. The State Committee reallocates surrendered acreage to other counties. 7 U.S.C. § 1344 (m) (2) (1938) as amended in 1963 and 1970 in Pub.Law 91–524 § 601(4) (e) (3), (f) (November 30, 1970); see the discussion in B. Parrish, supra, at 738; D. Westfall, Agricultural Allotments as Property, 79 Harv.L.Rev. 1180, 1198 (1966).

The records for Cameron County disclosed that during the last three crop seasons no acreage was surrendered to the State. In fact, the records disclosed that the Cameron County demand required the Cameron County Office Committee to request additional acreage from the State Committee. (See pp. 59–60, 84–86 of the March 9, 1971 Review Committee's hearings.)

The opinion and record evidence introduced before the Review Committee during its hearings constituted direct and circumstantial evidence. From this evidence the Committee could reasonably decide to affirm the decision of the lower agency.

To meet their burden of proving that a demand in Cameron County no longer existed as of March 3, 1971, plaintiffs called two Cameron County cotton producers to testify before the Review Committee on March 9, 1971. The Committee obviously weighed this testimony with the other evidence presented to it and obviously chose to discount it. This evidence developed no more than a fact issue for the Review Committee's resolution, and this Court cannot say that their findings were capricious or arbitrary under the circumstances of this case.

Both of the producers called by plaintiffs below testified that in their opinion and from their experiences there was no longer a market demand for cotton allotments in Cameron County on March 3, 1971. These men admitted, however, that they had ceased their own efforts to sell their allotments some time before March 3, 1971. Their testimony disclosed that they had contracted to transfer their allotments to out-of-county producers prior to March 3, 1971, but they did not disclose the dates the contracts were finalized. (See pp. 39–45, 48–52 of the March 9, 1971 Review Committee hearing).

One of the producers, Mr. Elmer E. Meek, testified that before he made his decision to transfer his allotments out of county, he contacted only one prospective in-county transferee. He admitted that he had been occupied with other agricultural problems before he entered the transfer contract and had not been actively engaged in the Cameron in-county allotment market. (See pp. 39–45, 48 of the March 9, 1971 Review Committee's hearing.) The testimony of the other producer, Mr. Milton E. Wenty, Jr., was more favorable to the plaintiffs' position. He testified that he had attempted to sell or lease his allotment to numerous county producers before he contracted to transfer his allotment to an out-of-county producer. His testimony did not disclose, however, exactly when he had made his offers. (See pp. 49–52 of the March 9, 1971, Review Committee's hearing.)

The Review Committee obviously concluded to discount the testimony of Mr. Meek and Mr. Wenty. Neither of them indicated when they contracted to transfer their allotments. It would have been reasonable for the Committee to assume that after they contracted to transfer their allotments, they were no longer interested participants in the in-county allotment market and therefore were not as well informed on the questions of demand as were the producers who had indicated they were still actively in the allotment market.

11. The evidence discussed, which is illustrative but not complete, demonstrates that there was substantial evidence before the Review Committee from which it could determine that as of March 3, 1971, there was and had been an active and present local market in Cameron County for the acquisition and use of cotton allotments.

Accordingly, it is ordered that the decision of the Review Committee be affirmed. The Clerk shall send copies of this instrument to counsel.

## APPENDIX I

## THE COURT'S MARCH 5, 1971 MEMORANDUM AND ORDER

Since the questions of law and procedure discussed here are applicable to each of the above cases, this Memorandum and Order will be filed in both.

In these cases plaintiffs sue to enjoin actions of the Agricultural Stabilization and Conservation Committees (hereafter called County Office Committee or C.O. C.) dealing with the transfer of cotton allotments pursuant to Public Law 91–524 § 601(3) (1) (a) and (2) (November 30, 1970) (hereafter called the Agricultural Act of 1970).

In Civil Action No. 71–B–23 the United States has moved to dismiss the complaint for various reasons, including failure to exhaust administrative remedies. The Court stayed its consideration of the motion on February 25, 1971, in open court, and advised the plaintiffs to exhaust their administrative remedies

with the County Office Committees and, if they believed necessary, the appropriate state review agency.

After further consideration of the pleadings and the relevant law, the Court is convinced that to exhaust their administrative remedies plaintiffs must apply to the appropriate County Office Committees and appeal any ruling they deem to be adverse to the approriate County Review Committee provided for in 7 U.S.C. § 1363 (1938) as amended (1951) and 7 C.F.R. §§ 711.1–711.27 (1970); see: Chandler v. David, 350 F.2d 669 (5th Cir. 1965); cert. denied 382 U.S. 977, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966).

During the March 3, 1971, pretrial conference the Court advised the parties of its tentative conclusion and that they should exhaust their remedies before the County Office Committee, which the parties have undertaken to do. Since then, counsel for the parties have been advised orally that any review of a County Office Committee decision should be had before a County Review Committee. The Court is informed that any such rulings of the County Review Committee can be obtained and be ready for consideration by this Court on March 11, 1971. See: 7 U.S.C. § 1365 (1938) as amended (1951).

The Court reached its conclusion that 7 U.S.C. §§ 1363–1366, governed the secondary administrative remedies in this case after an examination of the statutory language, the federal regulations and the relevant case law. Although § 1363 speaks specifically of reviewing County Office Committee's determinations of farm "quotas" the relevant federal regulations define the term quota to include acreage allotments. 7 C.F.R. 711.2(d) (1970).

In Chandler v. David, 350 F.2d 669 (5th Cir. 1965), cert. denied 382 U.S. 977, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966), the Court of Appeals for the Fifth Circuit determined that the appellate procedures enumerated in §§ 1363–1366 were the *exclusive* remedies available to farmers aggrieved by County Office Committee allotment transfer decisions. Implicit in this holding was the determination that the term "quota" as used in §§ 1363–1366 included the term acreage allotment. Id. 676–677. *Cf*: Allen v. David, 334 F.2d 592, 600 (5th Cir. 1964); cert. denied 379 U.S. 967 (1965); Gladney v. Review Committee, 257 F. Supp. 57 (W.D.La.1966); aff'd 380 F.2d 929 (5th Cir. 1966); cert. denied 389 U.S. 1036, 88 S.Ct. 770, 19 L.Ed.2d 824 (1967); Graham v. Lawrimore, 185 F. Supp. 761 (E.D.S.C.1960) aff'd 287 F.2d 207 (4th Cir. 1960). Therefore, before this Court can hear either of the above plaintiffs' cases, the dissatisfied parties, if any, must exhaust their remedies before the County Review Committee. Id.

The Court is of the opinion the scope of the term "demand" as used in § 601 (3) (1) (a) (2) (1) of the Agricultural Act of 1970 should now be delineated because the Court will be called upon to review the legal tests which the respective County Office Committees and Review Committees used in making their decisions to deny or to allow the transfer of cotton allotments.

Section 601(3) (1) (a) (2) requires that the County Office Committee approve the instate out-of-county transfer of cotton acreage allotments unless they find that there exists a "demand" for the acreage allotments in the respective transferor county. The Agricultural Act of 1970 does not define the term "demand" and no regulations have been promulgated by the Secretary or Department of Agriculture defining the test which the County Office Committees must use to ascertain if an in-county demand exists. Since no other court has defined this term as used in § 601, it is a question of first impression.

In an attempt to define the criteria implicit in the term "demand" as used in § 601, the Court examined the legislative history of the Act. This examination did not disclose any Congressional discussion of the term. The examination, however, did disclose that the 1970 Amendments to the Agricultural Act of

1938, as amended in 1965 and 1968, were the Congress' answers to the problems its previous enactments had caused to the cotton industry. Specifically, an examination of Congressional Committee reports and the comments of legislators and witnesses during committee hearings disclosed that Congress believed the prior law to have been too restrictive of native cotton production, and intended that the 1970 Amendments should cause an increase in the growth of domestic cotton. *See*: House Committee Report of the Agriculture Committee, 91–1329 (to accompany H.R. 18546) at 41 (7/23/70); Senate Committee Report of the Agricultural and Forestry Committee, 91–1154 (to accompany H.R. 18546) published in U.S.Cong. and Ad. News, at 6198–99 (8/28/70); Conference Committee Report (to accompany H.R. 18546) published in U.S.Cong. and Ad.News at 6213 (10/9/70); Senate Agricultural and Forestry Committee Hearings on H.R. 18546 at 433–445, 634–635, 637 (1970).

Because of this change in philosophy the regulations promulgated to facilitate the interpretation and use of the Agricultural Adjustment Act of 1938, 7 U.S. C. 1344 (1938) as amended in 1965 and 1968, are of no help in defining the scope and use of the term "demand" as used in the 1970 Agricultural Act § 601.

The Court, however, is not without the aid of the Secretary and Department of Agriculture's expertise on the scope of the term. Seven days (November 23, 1970) before the Act of 1970 was approved by the President, the Department of Agriculture distributed a handbook to the County Office Committees for their use in applying the new Act. The provisions of this handbook relevant to the determination of whether in-county demand existed were attached as exhibit A to plaintiff's original complaint in C.A. 71–B–23.[1]

■ Since it is undisputed that the handbook was not published in the Federal Register[2] and therefore not promulgated according to the strict requirements of the Administrative Procedure Act's notice provisions, 5 U.S.C. § 552(a) (1) (1946) as amended (1966), it cannot be accorded the dignity of a regulation having in substance the dignity of legislation. United States of America v. Morton Salt Co., 338 U.S. 632, 644–645, 70 S.Ct. 357, 94 L.Ed. 401; Graham v. Lawrimore, 185 F.Supp. 761 (E.D.S.C. 1960); aff'd 287 F.2d 207 (4th Cir. 1960); Hawkins v. State Ag. Con. Com., 149 F.Supp. 681, 687 (S.D.Tex.1957); aff'd 252 F.2d 570 (5th Cir. 1958). Since it does not constitute an official regulation of the Secretary or the Department of Agriculture, it is not binding upon the parties. *Id.*

■ The guidelines set out in the handbook are, however, to be accorded considerable weight by the Court in interpreting the meaning of § 601. In Skidmore v. Swift and Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124, (1944), the Supreme Court discussed the value of agency pronouncements which did not have the dignity of official regulations of the agency. There the Court states:

> We consider the rulings, interpretations, and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such judgments in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

---

1. The factual information discussed here is derived in part from the statements of counsel during the February 25, 1971, pretrial conference.

2. This information was disclosed to the Court by counsel during the February 25, 1971, pretrial conference.

*Id.*; In re Petition of Wong, 224 F.Supp. 155, 165 (S.D.N.Y.1963); Woods v. Benson Hotel Corp., 75 F.Supp. 743, 748 (D. Minn.1948); aff'd on other grounds; 168 F.2d 694 (8th Cir. 1948); vacated on other grounds; 81 F.Supp. 46 (D. Minn.1948).

Since the handbook was distributed only seven days before the Act was signed by the President and after both Houses of Congress had approved the Committee's Report, 1970 U.S.Cong. and Ad.News 6164 (12/20/70) the Court must conclude that Congress was not aware or guided by the provisions of the handbook. The Court, however, is compelled to conclude that the Secretary and Department of Agriculture had time to examine the pending legislation and to lend their expertise to the task of drafting a handbook which in their judgment would consistently implement the Congressional intent inherent in the 1970 Agricultural Act.

 The section of the handbook governing out-of-county in-state transfers of cotton allotments states:

§ 172 *Transfers out-of-county*

A. *Owner transfers.* No restrictions on transfers across county lines.

B. *Sale or Lease Transfers.* The COC shall determine whether to authorize out-of-county transfers.

1 *Original Determination*

 a. *Time of Original Determination.* By the date original allotment notices are mailed.

 b. *Basis for Approval.* A finding that acreage to be transferred is *no longer needed in the county* should be made and out-of-county transfers approved.

 (1) If, in the last transfer referendum, a simple majority of the producers voting authorized out-of-county transfers, or

 (2) If, released acreage was surrendered to the STC in a prior year, or

 (3) For any other reasonable basis.

2 *Reconsideration of Original Disapproval.* Within 30 days after mailing the original notices, the COC shall reconsider their determination not to authorize out-of-county transfers. At this time the COC should assume that all producers within the county have acquired all the acreage they desire to obtain, thus the COC should authorize out-of-county transfers.

Examination of these sections shows that in the expert opinion of the Department and Secretary of Agriculture, the term "demand" used in § 601(3) (1) (a) (2) (1) of the Agricultural Act of 1970 does not allow a County Office Committee determining if "demand" for cotton allotments exists to consider, for example, the general economic conditions in the transferor or transferee county, or the needs or demands of any persons or businesses in a particular county except the producers of cotton in the transferor county. The handbook makes it clear that in the opinion of the Department, which this Court shares, the Congress intended the term "demand" to create a test whereby the respective County Office Committees or Review Committees would limit their considerations and the facts to be considered by them to the determination of whether producers, otherwise entitled to additional cotton allotments, who resided in the transferor county, desired to acquire the allotments sought to be transferred out of county. In a given case, the desire of such producer to obtain the allotment proposed to be transferred out of county is equated with "demand" or "need" of the proposed transferor county. The Court is convinced that the test enumerated above is the only one which could reasonably have been intended by the Congress.

In making their determinations of whether demand now exists for the cotton allotments sought to be transferred,

the County Committees should consider the criteria for approval enumerated in § 172 1(b) and (2) and § 172(2) of the handbook.

In the context of time, it will be noted that the handbook suggests that the County Office Committee conduct what is in effect a continuing consideration of the question, "whether to authorize out-of-county transfers." It specifically mentions an "Original Determination" and "Reconsideration of Original Disapproval," together with the time for conducting each. This is consistent with the intent of the Congress that the 1970 Amendment encourage an increase in the growth of domestic cotton. If cotton allotments not in demand (not needed by the producers) in a transferor county are authorized to be transferred for planting out-of-county, it would insure the maximum acreage to be planted and thus encourage an increase in the growth of domestic cotton during the years covered by the 1970 Amendment.

While the County Committees for one reason or another may have failed to make the Original Determination or the Reconsideration of Original Disapproval within the time and manner contemplated by the guidelines, such failure would not relieve such Committees from the obligation now to act in such manner as to carry out the intent of the Congress that out-of-county transfers be authorized with respect to any and all allotments not desired for planting by the producers in a particular county in 1971. In reviewing any action of any County Office Committee or County Review Committee in subject cases, this Court will give particular consideration to the effectuation of the intent of the Congress.

Accordingly, it is ordered that the parties consider this Memorandum and Order while proceeding administratively. The Clerk shall send copies of this instrument to counsel.

---

I. By agreement of the parties and the approval of the Court, the claim against

# APPENDIX II

## THE COURT'S MARCH 18, 1971 MEMORANDUM AND ORDER

In these cases plaintiffs sue to enjoin actions of the Agricultural Stabilization and Conservation County Committees (hereafter County Office Committees) of Cameron, Willacy and Hidalgo Counties, Texas.[1] On March 5, 1971, the Court ordered that parties aggrieved by the decisions of the County Office Committees should exhaust their administrative remedies pursuant to the procedures enumerated in 7 U.S.C. § 1363 (1938) as amended (1951) before urging their claims in Federal Court. Pursuant to this Order the plaintiffs presented their complaints to the Agricultural Stabilization and Conservation Review Committee (hereafter Review Committee) having appellate jurisdiction over the County Office Committees in litigation here. *See*: 7 U.S.C. § 1363 (1938) as amended (1951); and 7 C.F.R. §§ 771.2–711.27 (1970) as authorized by 7 U.S.C. § 1375 (1938) as amended (1941). The Review Committee met on March 9, 1971, to review de novo the validity of the County Office Committees' determinations. That same day after hearing the argument of counsel and receiving the evidence, the Review Committee entered the following decision as its findings of fact and conclusions of law affirming the actions of the agencies below:

The Review Committee convened to review the decisions of the County Committees of Cameron and Hidalgo Counties hereby unanimously found the following:

There was a demand in Cameron County for the cotton acreage allotments which were the subject of applications for out of county transfer and therefore the decision of the Cameron County Committee not to permit out of county transfers and to deny said applications was proper and that decision is affirmed.

---

Willacy County was dismissed during the Court's March 11, 1971 hearing.

The Hidalgo County Committee properly found that there was no demand in Hidalgo County for cotton acreage allotments and therefore the decision of the Hidalgo County Committee to permit out of county transfers was proper and that decision is affirmed.

/s/ Raymond Hindes
Chairman
Review Committee

/s/ Harold H. Wakehouse
Vice-Chairman
Review Committee

/s/ Richard P. Horton
Member
Review Committee

Unfortunately, the decision is couched in ultimate and conclusionary terms and fails to articulate the basic factual findings which the Review Committee had to make in order to reach its determinations. The decision also fails to enumerate the legal criteria which the Review Committee applied.

After examining the transcripts of the proceedings before the Review Committee, the Court is unable to determine the legal or factual basis of its decision. During the March 9, 1971 hearing counsel representing the contesting parties were unable to agree upon the meaning of the term "demand" and the factual determinations to be made by the Review Committee.

Since the Review Committee failed to enunciate the legal principles to which it applied the evidence adduced at the hearing and failed to divulge the basic factual determinations which it made, the Court is forced upon its own motion to remand the cases to the Review Committee. If this Court were to now attempt to review the propriety of this administrative decision, the Court would be called upon to speculate and to imply the basic facts and law which the Review Committee used in reaching its determinations. Thus would be impermissible. Such speculation would in effect require the Court to engage in independent de novo fact finding. It is a basic maxim of federal administrative law that a court reviewing an agency's determinations cannot engage in independent fact finding, but instead must limit its review to the ascertainment of whether the agency correctly applied the law, and the ascertainment of whether there is substantial evidence in the agency's record to support its factual determinations. Jones v. Hughes, 400 F.2d 585, 590 (8th Cir. 1968); Chandler v. David, 350 F.2d 669 (5th Cir. 1965); cert. denied 382 U.S. 977, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966); Crolley v. Tatton, 249 F.2d 908, 910–912 (5th Cir. 1957); see also: Universal Camera Corporation v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Hayes v. Celebrezze, 311 F.2d 648 (5th Cir. 1963); Review Committee v. Willey, 275 F.2d 264, 273 (8th Cir. 1960); cert. denied 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed.2d 1522 (1960). Therefore, if this Court were to engage in a review of the Review Committee's determinations, it would be exceeding the powers granted to it by the Congress. To cure this problem, the Review Committee is ordered to amend its decision within five (5) days by the addition of proper findings of fact and conclusions of law. Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943); Great Lakes Screw Corp. v. N.L.R.B., 409 F.2d 375, 378–380, 380 n. 4 (7th Cir. 1969); Austin v. Jackson, 353 F.2d 910, 912 (4th Cir. 1965); Lautares v. Smith, 285 F.Supp. 578, 583 (E.D.N.C.1968); Stallard v. Review Committee, 275 F.Supp. 931 (W.D.Va.1967); 7 C.F.R. §§ 711.21(g), 711.23; 2 K. Davis, Administrative Law Treatise §§ 16.05; 16.06, 450; 16.07 (1958); see also: Crolley v. Tatton, 249 F.2d 908, 910–912 (5th Cir. 1957). The Court believes that it is appropriate to point out that the Review Committee is free to seek the assistance of all counsel as an aid to its formulation of its revised factual and legal determinations. See: Lautares v. Smith, supra. This is not, however, to be construed as an encroachment upon the Review Com-

mittee's power on remand, and the Committee is free to reach its revised decision in any manner it desires which is consistent with due process. *Cf.:* Crolley v. Tatton, supra; and Garvey v. Freeman, 397 F.2d 600 (10th Cir. 1968).

In order to facilitate the Review Committee's determinations, the Court is of the view it should reiterate and expand upon its discussion of the term "demand" as used in Public Law 91–524, § 601 (3) (1) (a) and (2) (11/30/71) (hereafter called the Agricultural Act of 1970). As the Court stated on pages 1252–1253 of its March 5, 1971 Memorandum and Order:

Section 601(3) (1) (a) (2) requires that the County Office Committee approve the instate out-of-county transfer of cotton acreage allotments unless they find that there exists a "demand" for the acreage allotments in the respective transferor county.[2] The Agricultural Act of 1970 does not define the term "demand" and no regulations have been promulgated by the Secretary or Department of Agriculture defining the test which the County Office Committees must use to ascertain if an in-county demand exists.[3] Since no other court has defined this term as used in § 601, it is a question of first impression.

In an attempt to define the criteria implicit in the term "demand" as used in § 601, the Court examined the legislative history of the Act. This examination did not disclose any Congressional discussion of the term. The examination, however, did disclose that the 1970 Amendments to the Agricultural Act of

2. The Act states in pertinent part:
Provided, that no farm allotment may be sold or based for transfer to a farm in another county unless the Agricultural Stabilization and Conservation Committee established pursuant to section 8(b) of the Soil Conservation and Domestic Allotment Act, as amended, for the county from which such transfers are being made (1) finds that the *demand* for such acreage allotments no longer exists in such county and (2) approves any transfers of allotments to farms outside such county. (Emphasis added).
(This footnote did not appear in the · original text.)

3. Counsel informed the Court during the March 11, 1971 hearing that the Department of Agriculture had submitted a regulation to the Federal Register for publication on March 10, 1971. No proof was or has been offered to demonstrate that the regulation was ever published as it must be to become official and binding. Kessler v. F.C.C., 117 U.S.App.D.C. 130, 326 F.2d 673 (1963). The copy of the purported regulation submitted to the Court states:
7 CFR § 722.418 *Transfers by Sale or Lease Across County Lines.*
Transfers by sale or lease across county lines within the same state may be authorized by the county committee of the county from which the allotment is to be transferred if the committee (1) finds that a demand for such base acreage allotments no longer exists in such county, and (2) approves any transfers of base acreage allotments to farms outside such county. The county committee shall make a determination whether transfers by sale or lease may be made at the time the original notification of cotton base acreage allotments are mailed to farm operators each year. If the determination is not to permit transfers by sale or lease to other counties, the determination shall be reconsidered by the county committee on a date 30 days following the original determination (except that for 1971, the date for reconsideration shall be by February 1, 1971) or on such later date as may be approved by the Deputy Administrator. To the extent practicable, the county committee shall give general publication to determinations under this section. In making its finding upon initial consideration and upon reconsideration whether a demand for base acreage allotments no longer exists in the county, the county committee should consider any factor reasonably related to such a demand. A stronger indication that such demand no longer exists would be (1) that a majority of the producers voting in the last transfers referendum voting to approve transfer from the county, or (2) that relating acreage was surrendered to the state committee in a recent year.

This regulation, albeit official or not, will not change the Court's subsequent discussion of the law and has been considered in same. (This footnote was not in the original text.)

1938, as amended in 1965 and 1968, were the Congress' answers to the problems its previous enactments had caused to the cotton industry. Specifically, an examination of Congressional Committee reports and the comments of legislators and witnesses during committee hearings disclosed that Congress believed the prior law to have been too restrictive of native cotton production, and intended that the 1970 Amendments should cause an increase in the growth of domestic cotton. *See:* House Committee Report of the Agriculture Committee, 91–1329 (to accompany H.R. 18546) at 41 (7/23/70); Senate Committee Report of the Agricultural and Forestry Committee, 91–1154 (to accompany H.R. 18546) published in U.S.Cong. and Ad.News, at 6198–99 (8/28/70); Conference Committee Report (to accompany H.R. 18546) published in U.S.Cong. and Ad.News at 6213 (10/9/70); Senate Agricultural and Forestry Committee Hearings on H.R. 18546 at 433–445, 634–635, 637 (1970).

Because of this change in philosophy the regulations promulgated to facilitate the interpretation and use of the Agricultural Adjustment Act of 1938, 7 U.S.C. § 1344 (1938) as amended in 1965 and 1968, are of no help in defining the scope and use of the term "demand" as used in the 1970 Agricultural Act § 601.

The Court, however, is not without the aid of the Secretary and Department of Agriculture's expertise on the scope of the term. Seven days (November 23, 1970) before the Act of 1970 was approved by the President, the Department of Agriculture distributed a handbook to the County Office Committees for their use in applying the new Act. The provisions of this handbook relevant to the determination of whether in-county demand existed were attached as exhibit A to plaintiff's original complaint in C.A. 71–B–23.[4]

Since it is undisputed that the handbook was not published in the Federal Register[5] and therefore not promulgated according to the strict requirements of the Administrative Procedure Act's notice provisions, 5 U.S.C. § 552(a) (1) (1946) as amended (1966), it cannot be accorded the dignity of a regulation having in substance the dignity of legislation. United States of America v. Morton Salt Co., 338 U.S. 632, 644–645, 70 S.Ct. 357, 94 L.Ed. 401; Graham v. Lawrimore, 185 F.Supp. 761 (E.D.S.C. 1960); aff'd 287 F.2d 207 (4th Cir. 1960); Hawkins v. State Ag. Con. Com., 149 F.Supp. 681, 687 (S.D.Tex.1957); aff'd 252 F.2d 570 (5th Cir. 1958). Since it does not constitute an official regulation of the Secretary or the Department of Agriculture, it is not binding upon the parties. *Id.*

The guidelines set out in the handbook are, however, to be accorded considerable weight by the Court in interpreting the meaning of § 601. In Skidmore v. Swift and Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), the Supreme Court discussed the value of agency pronouncements which did not have the dignity of official regulations of the agency. There the Court states:

We consider the rulings, interpretations, and options of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of

---

4. The factual information discussed here is derived in part from the statements of counsel during the February 25, 1971 pretrial conference. (This footnote was in the original text.)

 During the March 11, 1971 hearing plaintiffs' counsel in C.A. 71–B–25 introduced into evidence as Exhibit A a three-page excerpt from a later supplement for this handbook. These pages do not change the tests for determining the existence of "demand" which the Department of Agriculture had placed in its earlier supplementation to the handbook. (This note was not in the original text.)

5. This information was disclosed to the Court by counsel during the February 25, 1971 pretrial conference. (This footnote was in the original text.)

such judgments in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Id.*; In re Petition of Wong, 224 F.Supp. 155, 165 (S.D.N.Y.1963); Woods v. Benson Hotel Corp., 75 F.Supp. 743, 748 (D.Minn.1948); aff'd on other grounds; 168 F.2d 694 (8th Cir. 1948); vacated on other grounds; 81 F.Supp. 46 (D. Minn.1948).

Since the handbook was distributed only seven days before the Act was signed by the President and after both Houses of Congress had approved the Committee's Report, 1970 U.S.Cong. and Ad.News 6164 (12/20/70), the Court must conclude that Congress was not aware or guided by the provisions of the handbook. The Court, however, is compelled to conclude that the Secretary and Department of Agriculture had time to examine the pending legislation and to lend their expertise to the task of drafting a handbook which in their judgment would consistently implement the Congressional intent inherent in the 1970 Agricultural Act.

The section of the handbook governing out-of-county in-state transfers of cotton allotments states:

§ 172 *Transfers out-of-county*

A. *Owner Transfers.* No restrictions on transfers across county lines.

B. *Sale or Lease Transfers.* The COC shall determine whether to authorize out-of-county transfers.

1. *Original Determination*

a. *Time of Original Determination.* By the date original allotment notices are mailed.

b. *Basis for Approval.* A finding that acreage to be transferred is no longer needed in the county should be made and out-of-county transfers approved:

(1) If, in the last transfer referendum, a simple majority of the producers voting authorized out-of-county transfers, or

(2) If, released acreage was surrendered to the STC in a prior year, or

(3) For any other reasonable basis. *Reconsideration of Original Disapproval.* Within 30 days after mailing the original notices, the COC shall reconsider their determination not to authorize out-of-county transfers. At this time the COC should assume that all producers within the county have acquired all the acreage they desire to obtain, thus the COC should authorize out-of-county transfers.

Examination of these sections shows that in the expert opinion of the Department and Secretary of Agriculture, the term "demand" used in § 601(3) (1) (a) (2) (1) of the Agricultural Act of 1970 does not allow a County Office Committee determining if "demand" for cotton allotments exists to consider, for example, the general economic conditions in the transferor or transferee county or the needs or demands of any persons or businesses in a particular county except the producers of cotton in the transferor county. The handbook makes it clear that in the opinion of the Department, which this Court shares, the Congress intended the term "demand" to create a test whereby the respective County Office Committees or Review Committees would limit their considerations and the facts to be considered by them to the determination of whether producers, otherwise entitled to additional cotton allotments, who reside in the transferor county desire to acquire the allotments sought to be transferred out of county.

The Court is now convinced that the only manner, consistent with the Congressional intent, by which this desire could be evidenced would be a determination by the County Office Committee of whether there was and had been an active market for the purchase and lease

of the allotments on the day the Committee made its decision whether to allow the transfer of cotton allotments out of county.

 The existence of such a market could reasonably be found if it were shown that the cotton producers of the county in which the Committee sat were and had been engaged in the leasing and/or purchasing and selling of cotton allotments to one another on and before the day the County Office Committee made its determinations. Other evidence tending to show the existence of a market demand for the cotton allotments would be a showing that cotton producers of the county in which the County Office Committee sat were presently engaged in negotiations concerning the transfer in county of allotments, and/or had recently been submitting the requisite forms to the County Office Committee requesting the approval for their proposed in-county allotment transfers. If, however, it were shown that the county cotton producers were no longer engaging in the negotiation and/or leasing and selling of cotton allotments to one another, regardless what the causes for the cessation, the County Office Committee could reasonably conclude that a demand no longer existed for the in-county transfer of the allotments. This Court is of the opinion Congress intended that the requisite demand for the allotments would not be demonstrated by a showing that county cotton producers desired to engage in the buying or leasing of allotments at some future date after the County Office Committee reached its decision. Instead, the evidence of demand would have to demonstrate that the county producers had manifested their acquisitive desires in conduct already cognizable to the County Office Committee at the time they·made their determinations.

 The Court is convinced that the Congress intended to exclude from the criteria it believed would demonstrate demand any showing that the cotton producers of the county wanted or needed to acquire surrendered acreage by reallocation. This exclusion is reasonable because it augments the Congressional intention to insure the fullest production of cotton. It assures the highest potential use of the allotments by producers at an earlier time in the crop year, thereby minimizing the chance that allotments might not be used after their surrender. This legislative pronouncement is not modified because the counties involved in this litigation have always reallocated all the surrendered allotments, and, in fact, have received additional allotments from the State Committee. Instead, this Court must ignore the local county crop histories and assume that the Congress took these into account when it promulgated legislation having national effect. As further evidence of this Congressional intent, it is important to note that the experts in the Department of Agriculture who drafted the relevant sections of the handbook and of the proposed regulation quoted above did not include in the suggested tests to be used for the ascertainment of "demand" any reference to the desire of in-county producers to acquire allotments by reallocation after the surrender deadline for that county's allotments. This omission leads to the inescapable conclusion that the experts in the Department of Agriculture agree with this Court's interpretation of the legislative intent made above.

The Court believes that the criteria enumerated in § 172 1(b) and (2) and § 172(2) of the handbook and in the proposed regulation should also be considered by the Review Committee when it makes its redeterminations. It is important to note, however, that even if the results of both the specific tests for demand enumerated in the Department of Agriculture's pronouncements discussed above were adverse to the results of other reasonable tests of demand, these specific tests would not be absolutely binding. Instead, the agency making the determination would be free to weigh the results of the different tests of

demand it considered before making its decision.

Accordingly, it is further ordered that the Review Committee consider this Memorandum and Order while proceeding administratively. They should note that this Court will give particular consideration to the effectuation of the intent of the Congress. The Clerk shall send copies of this instrument to counsel and to the Review Committee.