ACCEPTED
03-12-00247-CV
5833244
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/25/2015 7:37:58 PM
JEFFREY D. KYLE
CLERK

## NO. 03-12-00247-CV

FILED IN
3rd COURT OF APPEALS
~~AUSTIN, TEXAS~~

6/25/2015 7:37:58 PM

JEFFREY D. KYLE
Clerk

## IN THE COURT OF APPEALS
## FOR THE THIRD JUDICIAL DISTRICT OF TEXAS
## AT AUSTIN

### ROLAND OIL COMPANY,
Appellant,

### VS.

### RAILROAD COMMISSION OF TEXAS,
Appellee.

On Appeal from the 353rd Judicial District Court
Travis County, Texas
Trial Court No. D-1- GN-08-003472

## APPELLANT'S MOTION FOR EN BANC RECONSIDERATION

JEFFREY R. AKINS
14350 Northbrook Drive, Suite 150
San Antonio, Texas 78232
Telephone: (210) 599-4905
Facsimile: (210) 490-2776
jrakins@sbcglobal.net

**COUNSEL FOR APPELLANT**

June 25, 2015

## ORAL ARGUMENT REQUESTED

# NO. 03-12-00247-CV

## IN THE COURT OF APPEALS FOR THE THIRD DISTRICT
## AUSTIN, TEXAS

### ROLAND OIL COMPANY,
Appellant,

### VS.

### RAILROAD COMMISSION OF TEXAS,
Appellee.

On Appeal from the 353rd Judicial District Court, Travis County, Texas
Trial Court No. D-1-GN-08-003472

## APPELLANT'S MOTION FOR EN BANC RECONSIDERATION

TO THE HONORABLE COURT OF APPEALS:

ROLAND OIL COMPANY asks the Court to grant this motion to reconsider the case en banc.

## A. Introduction

1. Appellant is Roland Oil Company; appellee is Railroad Commission of Texas.

2. A panel of the court issued the judgment and opinion in this case on February 27, 2015. A copy of the opinion is attached as Exhibit "A".

3. The panel that rendered judgment in this case consisted of Justices Rose (Chief Justice), Puryear, and Field.

4. The panel that rendered judgment denied Roland Oil Company's last timely filed motion for rehearing on June 10, 2015 by virtue of taking no action (automatically overruled).

## B. Argument & Authorities

5. The Court has the authority to grant this motion and submit the case to the full court, sitting en banc. Tex. R. App. P. 41.2, 49.7.

6. The primary issue in the appeal was whether Roland had a "good faith claim to title" to unitized oil and gas leases, under RRC rules, so as to be able to retain the plugging extensions previously granted by the RRC on two inactive injection wells and four inactive production wells on a waterflood unit operated by Roland. The RRC had concluded after an administrative hearing that Roland did not have a good faith claim to title. The court focused on the force majeure clause and the habendum clause

2

in the unit agreement, specifically as to what constituted unit "operations" (necessary to perpetuate the unit) under the unit agreement. The panel resolved the issue by holding that it was reasonable for the Commission to conclude that Roland's work on these six wells during a fifteen-month cessation of production did not constitute unit operations. The court affirmed the district court's judgment affirming the Commission's order.

7. The issue in this case presents such an extraordinary circumstance that resolution of the issue by the Court en banc is necessary. *See* Tex. R. App. P. 41.2(c), 49.7.

8. The opinion implicitly ratifies the RRC's conducting a trial under the guise of a mere hearing to determine if a "good faith claim to title" exists. By putting a microscope on the Unit Agreement language and the facts, as if it were a trial court, the RRC exceeded its jurisdiction and its authority under its own rule. Instead of questioning the RRC's authority/jurisdiction, the opinion also puts a microscope on the language and facts. This opens the door for lessors wanting to shoo off a lessee, to have title litigated for them, at no cost, by the RRC. The RRC will also appeal the case, saving even more money for the lessors.

9. The opinion further sets up Roland for a motion for summary judgment by the lessor(s) that the unit (and therefore the leases in the unit) has terminated. This motion would be based on res judicata, and would cite this Opinion.

10. The opinion converts the legal threshold of "good faith claim" into "fully adjudicated claim."

11. If a lessor filed a lawsuit for unit (and lease) termination, Roland would be able to assert all its contract interpretations and also assert that the unit agreement (and included leases) is valid and in effect. These claims would be made in good faith and would not be subject to sanctions as unmeritorious or frivolous. Yet, "good faith claim" in this case goes far beyond that standard. Under the RRC rule, a "good faith claim" is "a factually supported claim based on a *recognized legal theory* to a continuing possessory right in a mineral estate, such as *evidence of* a currently valid oil and gas lease . . ." (Opinion, pp. 3-4). (emphasis added). Roland's legal theories were that force majeure applied, and/or that unit "operations" was satisfied by the work on the six wells. These are recognized legal theories. Moreover, the definition requires "evidence", not matter-of-law proof, of a currently valid oil and gas lease.

12. Also, this opinion will set precedent within the Third Court of Appeals region, but will have the effect of setting precedent statewide because the RRC is in this court's jurisdiction. Lessors in Webb County can now have their termination claims *de facto* litigated in Travis County before the RRC.

13. Also, this opinion is contradictory (and thus confusing) in that it states, correctly, that:

4

(a)     Roland had already obtained a plugging extension on the wells (Opinion, p. 4),

(b)     based on the RRC's presumed conclusion that Roland did not have a good-faith claim to operate the lease, "... the Commission staff rejected Roland's arguments and recommended that the plugging extensions be cancelled" (Opinion, p. 5),

(c)     the hearing examiner issued a proposal for decision, "recommending that . . . the plugging extensions be cancelled" (Opinion, p. 5), and

(d)     the Commission issued a final order "cancelling the extensions" (Opinion, p. 5);

but the opinion later assumes that these wells were slated for plugging as follows:

(e)     the bulk of the "operations" evidence in the record relates to "*the repairs and testing on the Lease's inactive wells in preparation for their being plugged.*" (emphasis added) (Opinion, p. 17),

(f)     "But for purposes of our review, the evidence in the record shows that the work in question . . . was done in preparation for plugging those inactive wells . . ." (Opinion, pp. 17-18), and

(g)     " . . . *inactive wells slated to be plugged* do not and will not produce oil or gas." (Opinion, p. 18) (emphasis added).

14.     For reasons of jurisprudence, this contradiction should be addressed by the court. Moreover, the court is asked to take judicial notice of the fact that in a waterflood unit, wells can be reactivated based on new technology or changed economics, and in that sense, based on reasonable inference, these wells were tested, repaired, and tested again, and plugging extensions obtained, so that these wells were

5

available for later use in unit operations. All of this was "for or on account of the development and operation of the Unitized Formation" as provided in the Unit Agreement. (Opinion, pp. 14-15).

15. For these reasons the opinion should be reconsidered.

## C. Oral Argument Requested

The court should grant oral argument for the following reasons:

a. Oral argument would give the court a more complete understanding of the facts and law presented in this appeal. This case involves the interpretation of a unit agreement for a secondary recovery unit (water injection) in which the unit is treated as one well. This is a different animal than a pooled unit. It involves an administrative agency acting as a *de facto* court of law as to Roland's standing to operate, under a threshold standard of "good faith claim." Moreover, the court has written two opinions with two different results, the second of which contains material contradictory factual assumptions.

b. Oral argument would allow the Court to better analyze the complicated legal issues presented in this appeal. For example, how far does the "good faith claim" rule allow the RRC to go in its inquiry, and what are the underlying facts.

6

## D. Prayer

16. For these reasons, Roland Oil Company asks the Court to grant this motion to reconsider the case en banc.

Respectfully submitted,

By: /s/ Jeffrey R. Akins
JEFFREY R. AKINS
State Bar No. 00962425
14350 Northbrook Drive, Suite 150
San Antonio, Texas 78232
Telephone: (210) 599-4905
Facsimile: (210) 490-2776
jrakins@sbcglobal.net
**ATTORNEY FOR APPELLANT,
ROLAND OIL COMPANY**

## CERTIFICATE OF COMPLIANCE

This motion complies with the volume limitation of Tex. R. App. P. 9.4 because it contains 1,169 words, excluding the parts of the motion exempted by Tex. R. App. P. 9.4(i)(1). The undersigned relied on the word count of MS Word, the computer program used to prepare the brief.

/s/ Jeffrey R. Akins
Jeffrey R. Akins

7

# CERTIFICATE OF SERVICE

I hereby certify that, on the 25TH day of June, 2015, a true and correct copy of the above and foregoing document has been served upon the following counsel of record, electronically through an electronic filing service provider.

Anthony W. Benedict
Assistant Attorney General
Natural Resources Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Anthony.benedict@texasattorneygeneral.gov
Counsel for Railroad Commission of Texas

Dario Bargas
Bargas Law Firm
1000 Heritage Center Circle
Round Rock, Texas 78664
Counsel for Appellant

/s/ Jeffrey R. Akins
Jeffrey R. Akins

8

Exhibit "A"

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

### NO. 03-12-00247-CV

**Roland Oil Company, Appellant**

v.

**Railroad Commission of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. D-1-GN-08-003472, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

We grant the motion for rehearing filed by the Railroad Commission, withdraw our opinion and judgment dated August 29, 2014, and substitute the following in their place. We dismiss as moot the Commission's motion for en banc reconsideration.

This is an administrative appeal from a 2008 Railroad Commission final order cancelling an extension of time to plug inactive wells operated by appellant Roland Oil Company. The principal basis for the Commission's order was that Roland lacked a good-faith claim to operate the oil and gas lease on which the subject wells were located. The district court affirmed the Commission's order, and we will affirm that judgment.

## Background

Since 1994, Roland has been the operator under the North Charlotte Field Unit Lease in Atascosa County, Texas.[1] The Lease, identified by the Commission as Lease No. 03220, consists of 31 wells that had been drilled as early as the 1950s, some of which are inactive. Commission Rule 14 requires that "dry or inactive well[s]" be plugged either within one year after drilling operations cease or, in the case of "delinquent inactive wells," "immediately unless the well is restored to active operation."[2] Former Commission Rule 14 also required that an inactive well more than twenty-five years old that had been inactive more than one year be tested to ensure that it posed no potential threat to natural resources before it is plugged.[3] The tests used to satisfy this rule, which are called "H-15" and "H-5" in reference to the form submitted to the Commission to report the results, examine fluid level and mechanical integrity of production wells (H-15) and the pressure

---

[1] In this context, "unit" or "unitization," simply described, refers to the consolidation or merger of the interests in multiple producing leases or wells located in a single formation of oil or gas. A primary legal consequence is that production and operation anywhere on the unit is treated as if they have taken place in all of the underlying leases within the unit. *See Southeastern Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 170 (Tex. 1999).

[2] *See* 16 Tex. Admin. Code § 3.14(b)(2) (2008) (Railroad Commission, Plugging) (cited hereinafter as "Former 16 Tex. Admin. Code § 3.14"). We cite to the version of Rule 14 in effect during the underlying contested-case hearing, but note that the intervening amendments to the rule did not affect provisions at issue here. *See* 29 Tex. Reg. 8271 (2004), *proposed* 29 Tex. Reg. 5994, 6003–04 (2004), *amended by* 32 Tex. Reg. 287 (2007), *proposed* 31 Tex. Reg. 9175, 9176 (2006). The current version of this rule was promulgated in 2012, *see* 37 Tex. Reg. 4892 (2012), *proposed* 37 Tex. Reg. 2287, 2288–89 (2012), but some version of Commission Rule 14 has been in effect since 1967, *see* Tex. R.R. Comm'n, Rule 051.02.02.014 (1967), *adopted by* Docket No. 20-65-5518.

[3] *See* Former 16 Tex. Admin. Code § 3.14(b)(2)–(3).

within injection wells (H-5).[4] Failure to comply with these requirements, among others, can result in Commission action preventing an operator from producing under a lease.

In early 2005, Roland asked the Commission for an extension of time to complete the required testing on certain inactive wells on the Lease. Upon inspecting the Lease and reviewing its history, the Commission determined that Roland had been delinquent on the required testing since 1994 and found additional violations. As a consequence, the Commission denied Roland's extension request and issued a February 2005 "severance" order effectively barring Roland from producing from any well on the Lease. Roland ceased production as of May 2005, and would not resume until August 2006—an interruption of approximately fifteen consecutive months—after Roland completed certain repairs necessary for the testing and the required testing itself to the Commission's satisfaction, and the agency lifted its severance order.

Meanwhile, in June 2006, a mineral owner under the Lease had alerted the Commission to his contention that the Lease had lapsed during the period of non-production. This contention potentially implicated Roland's entitlement to an extension of time from the Commission to complete the required testing and plugging measures on the inactive wells (and, in turn, Roland's ability to avoid the consequences of noncompliance), as the Commission's rules allowed the agency to grant such an extension only if, among other requirements, the "operator has, and upon request provides evidence of, a good faith claim to a continuing right to operate the well."[5] A "good faith

---

[4] *See id.* § 3.14(b)(2)(A)(iv).

[5] *Id.* § 3.14(b)(2)(A)(iii) (unbonded operators), (B)(ii) (bonded operators); *see Magnolia Petroleum Co. v. Railroad Comm'n,* 170 S.W.2d 189, 190–91 (Tex. 1943). (recognizing need for permit applicant to make "a reasonably satisfactory showing of a good-faith claim of ownership" in the property to Commission).

3

claim" in this context is "a factually supported claim based on a recognized legal theory to a continuing possessory right in a mineral estate, such as evidence of a currently valid oil and gas lease or a recorded deed conveying a fee interest in the mineral estate."[6]

Commission staff notified Roland of the mineral owner's assertion and asked Roland to provide evidence of its good-faith claim to operate the North Charlotte Field Unit Lease, adding that failure to do so would result in cancellation of Roland's plugging extension, which in turn would require immediate plugging of the Lease's inactive wells.[7] In response, Roland asserted (and the Commission does not dispute) that the relevant instrument in this regard is a 1962 "Unit Agreement"[8] whose term is "for the time that [oil and gas] are produced in paying quantities and as long thereafter as Unit Operations[9] are conducted without a cessation of more than ninety (90) consecutive days." Although Roland did not dispute that production had ceased during the time

---

[6] Former 16 Tex. Admin. Code § 3.14(a)(1)(E). It should be emphasized that the Commission's determination regarding the good-faith-claim requirement bears upon its authority to grant oil and gas permits under the conservation laws, but does not determine or affirmatively create title or a right of possession in the property itself. *See Magnolia*, 170 S.W.2d at 190–91. Likewise, our decision here addresses only the correctness of the Commission's actions, not any underlying property rights.

[7] *See* Former 16 Tex. Admin. Code § 3.14(b)(2)(A)(iii) (allowing Commission to grant an extension of the deadline for plugging if, among other requirements, the operator submits "a statement that the operator has, and on request will provide, evidence of a good-faith claim to a continuing right to operate the well").

[8] There were actually two unit agreements, one signed by the working interest owners, the other by the royalty interest owners, but the parties agree that the material terms of each instrument are identical.

[9] As will be discussed in more detail below, the agreement defines "Unit Operations" as "all operations conducted . . . pursuant to this agreement . . . for or on account of the development and operation of the [underlying formation] for the production of [oil and gas]."

4

period the Commission's severance order was in effect, Roland denied that the Unit Agreement had lapsed, urging that the Commission's severance order had triggered the agreement's force majeure clause and suspended its obligation to conduct "Unit Operations" and, in the alternative, arguing that its repair and testing activities constituted "Unit Operations."

For reasons that are not specifically expressed in the record, but presumably based on the conclusion that Roland did not have a good-faith claim to operate the Lease, the Commission staff rejected Roland's arguments and recommended that the plugging extensions be cancelled. In response, Roland sought and was granted a contested-case hearing on the issue.[10] At the conclusion of the contested-case hearing, the hearing examiner issued a proposal for decision recommending that the Commission conclude Roland lacked a good-faith claim to operate the Lease and that the plugging extensions be cancelled. Specifically, the hearing examiner concluded that because Roland had not produced any oil or gas or conducted Unit Operations for more than 90 days between May 2005 and August 2006, Roland lacked a good-faith claim to operate the Lease. Ultimately, the Commission issued a final order adopting the hearing examiner's findings of fact and conclusions of law and cancelling the extensions.

After exhausting its remaining remedies before the Commission, Roland filed a suit for judicial review of the Commission's final order in Travis County District Court. The district court affirmed the Commission's final order. Roland appeals that judgment.

---

[10] *See* Former 16 Tex. Admin. Code § 3.14(b)(2)(C)(ii) ("If the Commissioner or its delegate declines to grant or continue a plugging extension or revokes a previously granted extension, the operator shall either return the well to active operation or, within 30 days, plug the well or request a hearing on the matter.").

## Analysis

Roland brings two issues on appeal, both of which ultimately challenge the Commission's construction of the Unit Agreement and its resulting conclusion that Roland had not demonstrated a good-faith claim to operate the North Charlotte Field Unit lease. First, Roland argues that under the plain language of the Unit Agreement, the Commission's February 22, 2006 severance order was "an order of a governmental body" that excused the period of non-production under the agreement's force majeure provision. Second, Roland contends that the plain language of the Unit Agreement provides that the testing and repairs Roland undertook during the cessation of production constitute "Unit Operations" that served to continue the term of the agreement.

### Standard of review

The parties agree that our review of the Commission's final order is governed by the "substantial evidence" standard codified in the Administrative Procedure Act.[11] This standard requires that we reverse or remand a case for further proceedings "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are:

    (A)    in violation of a constitutional or statutory provision;
    (B)    in excess of the agency's statutory authority;
    (C)    made through unlawful procedure;
    (D)    affected by other error of law;
    (E)    not reasonably supported by substantial evidence considering the reliable and
           probative evidence in the record as a whole; or

---

[11] *See* Tex. Gov't Code § 2001.174 (codifying "substantial evidence" standard); *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995) (applying APA substantial-evidence standard to Commission decision under Texas Natural Resources Code).

6

(F)     arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.[12]

In reviewing fact-based determinations under this standard, we simply ask whether, considering "the reliable and probative evidence in the record as a whole," some reasonable basis exists in the record for the agency's action.[13] We apply this analysis without deference to the district court's judgment.[14] We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden is on the contestant to demonstrate otherwise.[15]

To the extent that the issues presented here turn on the construction of the Unit Agreement, the interpretation of an unambiguous contract is a question of law that we review de novo.[16] As such, we are not bound by the Commission's interpretation of an unambiguous

---

[12]  Tex. Gov't Code §2001.174(2).

[13]  *See id.* § 2001.174(2)(E); *Texas Indus. Energy Consumers v. CenterPoint Energy Houston Elec., LLC*, 324 S.W.3d 95, 105 (Tex. 2010) (citing *Mireles v. Texas Dep't of Pub. Safety*, 9 S.W.3d 128, 131 (Tex. 1999) ("A court applying the substantial evidence standard of review may not substitute its judgment for that of the agency. The issue for the reviewing court is not whether the agency's decision was correct, but only whether the record demonstrates some reasonable basis for the agency's action. Courts must affirm administrative findings in contested cases if there is more than a scintilla of evidence to support them.") (citations omitted)); *Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 210–11 (Tex. 1991); *Texas Health Facilities Comm'n v. Charter Med.–Dallas, Inc.*, 665 S.W.2d 446, 452–53 (Tex. 1984).

[14]  *See Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam).

[15]  *See Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 549 (Tex. App.—Austin 2011, pet. denied).

[16]  *See, e.g., Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (if contract is unambiguous, court will construe contract as question of law).

7

contract.[17] When construing a written contract, we "ascertain the intent of the parties as expressed in the instrument,"[18] giving the language in the agreement "its plain, ordinary, and generally accepted meaning," unless doing so "would defeat the parties' intent."[19] If a contract is ambiguous, its interpretation is a matter for the fact finder.[20] Such findings of fact would be reviewed in the same manner as other agency fact findings, that is for support by substantial evidence.[21]

**Commission's decision**

The Commission's decision to deny Roland's plugging extension for failure to demonstrate "a good faith claim to a continuing right to operate" the Lease was based principally on its underlying findings of fact that (1) Roland produced no hydrocarbons from the Unit and conducted no Unit Operations on the Unit from May 2005 through July 2006 (a period of 15 consecutive months), and (2) the Unit Agreement provides that it terminates if there is a cessation in the production of hydrocarbons or Unit Operations of more than 90 days. In reaching its ultimate conclusion, the Commission also necessarily rejected Roland's argument that the Unit Agreement's force majeure provision excused the gap in hydrocarbon production. That rejection was based on the Commission's legal conclusion that force majeure provisions apply only when the force majeure event relied on is beyond the reasonable control of the operator and, in turn, on its related finding

[17] *See Texas Workers' Comp. Ins. Facility v. State Bd. of Ins.*, 894 S.W.2d 49, 52 (Tex. App.—Austin 1995, no writ).

[18] *See Coker*, 650 S.W.2d at 393.

[19] *See DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999).

[20] *See Coker*, 650 S.W.2d at 394.

[21] *See* Tex. Gov't Code § 2001.174; *Charter Med.–Dallas*, 665 S.W.2d at 452–53.

8

of fact that the Commission issued the severance order in this case due to long-overdue testing on six inactive wells, but that it had been within the reasonable control of Roland to stay current on that regulatorily-required testing. The Commission also necessarily rejected Roland's argument that the repairs and testing it performed on the Lease's inactive wells during the gap in production constituted Unit Operations such that there was no cessation in those operations to trigger termination of the Unit Agreement. The Commission, concluding that "operations" requires work directed at actually producing oil or gas, found that the work Roland performed on inactive wells during the 15-month gap did not contribute to the production of hydrocarbons.

### *Force majeure*

In its first issue, Roland challenges the Commission's general legal conclusion that force majeure provisions apply only where the force majeure event being relied upon is beyond the reasonable control of the party invoking the provision. Roland counters that, despite the Commission's apparent conclusion to the contrary, there is no general rule regarding the applicability of force majeure clauses; instead, their scope and application, like every contract provision, depend on the specific language used in the contract.[22] The language used in the Unit agreement, Roland urges, provides that its obligations are excused if a "rule, regulation, or order of a governmental agency" prevents compliance. Thus, Roland concludes, because there is no question that the

---

[22] Roland cites to *Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 282–83 (Tex. App.—Amarillo 1998, pet. denied) ("Force majeure[] is now little more than a descriptive phrase without much inherent substance. Indeed, its scope and application, for the most part, is utterly dependent upon the terms of the contract in which it appears.") and *Hydrocarbon Mgmt., Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 436 (Tex. App.—Amarillo 1993, no writ) ("We note initially that the lease terms are controlling regarding force majeure, and common law rules merely fill in gaps left by the lease.") to support this assertion.

Commission's 2005 order of severance was an "order of a governmental agency" that required Roland to stop production, the cessation in production that might otherwise serve to default the lease was excused. In sum, Roland contends that the Commission abused its discretion by improperly construing and interpreting the force majeure provision of the Unit agreement.[23]

Although we agree with Roland that the scope and effect of a force majeure clause depend ultimately on the specific language used in the contract and not on any traditional definition of the term,[24] the specific language of the Unit Agreement's force majeure provision incorporates the common-law force majeure requirement that performance become impossible or impracticable as a result of an event or effect that the parties could not have anticipated or controlled:[25]

### FORCE MAJEURE

16.1 Force Majeure. All obligations imposed by this agreement on each party, except for the payment of money, shall be suspended while compliance is prevented, in whole or in part, by a strike, fire, war, civil disturbance, act of god; by federal, state, or municipal laws; by any rule, regulation, or order of a governmental agency; by inability to secure materials; *or by any other cause or causes beyond reasonable*

---

[23] *See* Tex. Gov't Code § 2001.174(F) (requiring reviewing court to reverse agency decision that is "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion").

[24] *See Virginia Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 402 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (citing *Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc.*, 157 S.W.3d 462, 466 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Perlman v. Pioneer Ltd. P'ship*, 918 F.2d 1244, 1248 n. 5 (5th Cir. 1990)).

[25] *See Black's Law Dictionary* 761 (10th ed. 2014) (defining "force majeure" and "force majeure clause"); 30 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 77:31 (4th ed. 1990 & Supp. 2004) (specific language of clause indicates what events will excuse performance and typical clause states that party's performance is subject to "acts of God, war, government regulation, terrorism, disaster, strikes . . . civil disorder, curtailment of transportation facilities, or any other emergency beyond the parties' control").

10

*control of the party*. No party shall be required against its will to adjust or settle any labor dispute. Neither this agreement nor any lease or other instrument subject hereto shall be terminated by reason of suspension of Unit Operations due to any one or more of the causes set forth in this Article.

(Emphasis added.) Not only does this provision use the phrase "force majeure" twice in identifying and describing itself, it also incorporates the force majeure concept that the event be beyond control by giving a list of specific events and then including "other" of those type events that are "beyond reasonable control of the party."

Considering the Unit Agreement as a whole and taking its words in context, we conclude that the force majeure clause at issue here is subject to only one reasonable interpretation, which is that any potential triggering event of the clause must be beyond the control of the party.[26] In so concluding, we rely on the language used in the clause itself—specifically, the adjective "other" modifying "causes or causes beyond the control of the party." In this context, "other" means "additional" or "remaining" of a group or type not already mentioned.[27] As such, the phrase "other cause or causes beyond the control of the party" indicates the last of a group of like or similar things, with the similarity or commonality being events that are beyond a person's control. That "group" of like or similar things that are beyond a person's ability to control consists of the traditional force majeure events specifically described in the clause: "strike, fire, war, civil disturbance, act of god";

---

[26] *See Coker*, 650 S.W.2d at 394 (noting among other contract-interpretation considerations that we examine entire writing and an ambiguity does not exist unless the meaning is "uncertain and doubtful or it is *reasonably* susceptible to more than one meaning." (emphasis added)).

[27] *See Webster's Third New Int'l Dictionary* 1598 (2002) (defining "other" as including "remaining," "more," and "additional").

11

"federal, state, or municipal laws"; "any rule, regulation, or order of a governmental agency"; and "inability to secure materials."[28]

Roland disagrees, arguing that each of the specific list of events in this clause stand alone and is not modified or described by the phrase "by any other cause or causes beyond the reasonable control of the party." Thus, it maintains, "any rule, regulation, or order of a governmental agency," is a force majeure event regardless of the underlying circumstances. But this is not a *reasonable* construction of the Unit Agreement's force majeure provision.[29] Under Roland's interpretation, a fire that was directly controlled or caused by Roland would trigger the Unit Agreement's force majeure clause. Likewise, any inability to secure materials, including Roland's refusal to pay for materials, would trigger this clause. Further, and more directly relevant here, Roland's failure to obtain any State license could conceivably be offered as a force majeure event under Roland's interpretation regardless of the reason for the failure.

---

[28] *See State v. Fidelity & Deposit Co. of Md.*, 223 S.W.3d 309, 311–12 (Tex. 2007) (determining "other necessary structure related to a public road" in statute defining "highway" to include "public road or part of a public road or bridge, culvert, or other necessary structure related to a public road," did not include TxDOT research and technology center because that phrase directly related to preceding "bridge" and "culvert" and thus, "likewise pertains to the physical function of the road, such as a guard rail"); *Toungate v. Bastrop Indep. Sch. Dist.*, 842 S.W.2d 823, 828 (Tex. App.—Austin 1992, no writ) (holding that "any other order" in statute restricted meaning to same class of orders described in provision).

[29] *See, e.g.*, *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987) (noting that courts should "avoid when possible and proper a construction which is unreasonable"); *Coker*, 650 S.W.2d at 393 (noting that "contract is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning").

Finally, as suggested above, Roland's interpretation would require ignoring the existence of "other" in this provision.[30] If the drafters of the agreement intended to excuse the specific events listed without regard to control, as Roland urges, but also excuse any event that was beyond the reasonable control of the party, then it was unnecessary to include the word "other"—e.g., All obligations shall be suspended while compliance is prevented by a strike, fire, war, civil disturbance, act of god; by any rule, regulation, or order of a governmental agency; or by any cause or causes beyond reasonable control of the party. By including "other," the drafters expressed, we conclude, a clear intent that the force majeure cause or causes relied on be beyond the reasonable control of the party.[31] Accordingly, although the Commission's declaration regarding the scope of force majeure clauses may go too far, its ultimate decision that the Unit Agreement's force majeure clause was not triggered by the Commission's order of severance because it was within the reasonable control of Roland was correct on the record here, and we will not reverse a right decision even in the face of a wrong legal explanation.[32] We overrule Roland's first issue.

---

[30] *See Sargent v. Highlite Broad. Co.*, 466 S.W.2d 866, 868 (Tex. Civ. App.—Austin 1971, no writ) ("'The terms of a contract must, if possible, be construed to mean something rather than nothing at all.'" (quoting *Portland Gasoline Co. v. Superior Mktg. Co.*, 243 S.W.2d 823, 824 (Tex. 1951), *overruled on other grounds, Northern Natural Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 608 (Tex.1998))).

[31] *See, e.g., Sun Operating*, 984 S.W.2d at 288 ("[I]n listing circumstances beyond the lessee's control last, the parties intended that the "cause[s], occurrence[s] or circumstance[s]" enumerated before it be outside the lessee's reasonable control before they could serve as force majeure."); *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 241 (Tex. App.—Corpus Christi 1994, writ denied) (refusing to apply force majeure clause where Commission order well shut because lessee's failure to comply with regulations was within lessee's reasonable control).

[32] *See ICON Benefit Adm'rs II, L.P. v. Abbott*, 409 S.W.3d 897, 903–04 (Tex. App.—Austin 2013, pet. denied) (citing *Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.*, 284 S.W.3d 416,

13

*"Unit operations"*

In its second issue, Roland challenges the Commission's legal conclusion that "operations" means "actual work done in a good faith endeavor to cause a well to produce oil and/or gas in paying quantities" Specifically, Roland asserts that under a proper interpretation of the Unit Agreement, the work or operations that Roland performed on the Lease's inactive wells during the gap in production constitute "Unit Operations" that extended the term of the Lease, despite the gap in hydrocarbon production. In making this argument, Roland relies on two provisions of the Unit Agreement, the first of which specifies the duration of the agreement:

> 18.1 Term.  The term of this agreement shall be for the time that Unitized Substances[33] are produced in paying quantities *and as long thereafter as Unit Operations are conducted without a cessation of more than ninety (90) consecutive days,* unless sooner terminated by Working Interest Owners in the manner herein provided.

(Emphasis added.) Focusing on the above-emphasized language, Roland contends that the term of the Unit Agreement is perpetuated not only by the production of oil and gas in paying quantities, but also by the continuation of "Unit Operations," which the agreement defines as follows:

> 1.15 Unit Operations means all operations conducted by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement for

---

442 (Tex. App.—Austin 2009, no pet.)) (noting that a trial court does not abuse its discretion if it reaches the right result for the wrong reason).

[33] The agreement defines "Unitized Substances" as "oil, gas, gaseous substances, sulphur contained in gas, condensate, distillate, and all associated and constituent liquid or liquefiable hydrocarbons."

14

or on account of the development and operation of the Unitized Formation[34] for the production of Unitized Substances.

During the gap in hydrocarbon production at issue here, Roland maintains, it conducted these "Unit Operations" by performing repairs and testing on the Lease's inactive wells as required by Commission Rule 3.14. Those repairs and tests are "Unit Operations," Roland contends, because they were, quite simply, "operations conducted by . . . the Unit Operator" pursuant to the agreement—i.e., the general work, including repairs and testing, that are performed to maintain the Lease. Therefore, Roland concludes, the term of the Lease continued under provision 18.1 because "Unit Operations [were] conducted without a cessation of more than 90 days."

But Roland's proffered interpretation of "Unit Operations" is incomplete. Although broadly referring to "all operations conducted" by a working-interest owner or operator, the agreement's definition also requires that the operations be conducted "for or on account of the development and operation of the Unitized Formation for the production of Unitized Substances." In other words, the plain language of the agreement limits the scope of "Unit Operations" to those activities that are taken in connection with producing oil and gas. This limitation, or narrowing of the common meaning of "operations," is consistent with the specialized meaning of "operations" that has developed in oil and gas law, which is those activities conducted in a good faith effort to achieve production.[35] Thus, for Roland's repairs and testing to be considered "Unit Operations" under the

---

[34] Stated generally, the agreement defines "Unified Formation" as the specific geological formation located under the Unit from which oil, gas, etc. is drawn.

[35] *See, e.g., Ramsey v. Grizzle*, 313 S.W.3d 498, 510 (Tex. App.—Texarkana 2010, no pet.) ("Actual physical work being done on equipment in a good faith effort to place it in working order to produce oil constitutes sufficient operations to maintain the lease."); *Hydrocarbon Mgmt.,*

15

agreement, they must have been activities conducted in an effort to produce oil or gas. This closely matches the Commission's conclusion that "operations means actual work being done in a good faith endeavor to cause a well to produce oil and/or gas in paying quantities" and, as such, comports with both the Unit Agreement's definition of "Unit Operations"[36] as wells as the technical or specialized meaning that "operations" has acquired in the oil and gas context.[37] Accordingly, the Commission's legal conclusion regarding the meaning of "operations" was not in error.[38]

In addition to challenging the Commission's interpretation of "operations," Roland suggests that the Commission's related underlying findings of fact, expressed as follows, are not supported by substantial evidence:

> The relevant lease operations that Roland engaged in during the severance period between May, 2005 and August, 2006, were confined to those acts necessary to

861 S.W.2d at 438 (noting that "the intention of the parties was for the lessees to do something that would bring about the exploration and production of oil and gas" and that "lessee should not be allowed to maintain a lease without conducting activities that would cause the well to produce"); *Cox v. Stowers*, 786 S.W.2d 102, 105 (Tex. App.—Amarillo 1990, no writ) (concluding that term "reworking operations" means "good faith effort[s] to cause a well or wells to produce oil or gas in paying quantities"); *Lab Oil Co. v. Bentz*, 380 S.W.2d 846, 847 (Tex. Civ. App.—Corpus Christi 1964, no writ) ("The meaning of the word 'operations' in drafting the lease, unquestionably denoted to the parties the meaning of doing those things that would continue the quest for production.")

[36] *See Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 823 (Tex. 1997) ("[W]hen terms are defined in a[ contract], those definitions control.").

[37] *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005) (noting acceptability of applying technical meaning to contract terms where appropriate (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996) (applying "well accepted meanings in oil and gas industry" to terms "royalty" and "market value at the well")).

[38] *See* Tex. Gov't Code § 2001.174; *Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd.*, 156 S.W.3d 91, 98–99 (Tex. App.—Austin 2004, pet. denied) (noting that we review agency legal conclusions for errors of law).

16

pass Commission required H-15 and H-5 testing. The wells were inactive before the testing and inactive after the testing. They did not contribute to the development of the unitized formation for the production of oil and/or gas.

We disagree.

The bulk of the "operations" evidence in the record relates to the work Roland performed in connection with efforts to comply with former Commission Rule 3.14, specifically the repairs and testing on the Lease's inactive wells in preparation for their being plugged. This evidence included specific information regarding the type of work or tests done, the inactive wells on which the work or tests were done, and when the work or tests were performed. While there is some evidence in the record of other work that Roland performed on the Lease—i.e., "constant" maintenance-oriented work, including flow-line repair, electrical repairs, pump repairs, monitoring for leaks, mowing the grass, and road inspections—that evidence does not specify when this work was done, how often it was done, or whether it was performed on any of the Lease's active wells. Regardless, under the applicable substantial-evidence standard of review, we ask only whether some reasonable basis exists in the record for the agency's action.[39] That standard was met here.

Roland, challenging the Commission's specific finding that its work during the gap did not contribute to the production of oil and gas, questions why it would bother to spend time and money conducting repairs and testing on inactive wells if not to eventually produce oil and gas. But for purposes of our review, the evidence in the record shows that the work in question was performed on inactive wells to comply with former Commission Rule 3.14, that it was done in preparation for

_____

[39] *See Charter Med.*, 665 S.W.2d at 453 (noting that test is whether some reasonable basis exists in the record for agency's action (citing *Gerst v. Nixon*, 411 S.W.2d 350, 354 (Tex. 1966)).

17

plugging those inactive wells, and that those wells remained inactive after the required testing. Inactive wells do not produce oil or gas;[40] moreover, inactive wells slated to be plugged do not and will not produce oil or gas.[41] Accordingly, it was reasonable for the Commission to conclude that Roland's work did not actually contribute to the production of oil and gas, and thus did not constitute good-faith endeavors to produce oil and gas.[42]

We overrule Roland's second issue.

## CONCLUSION

Having overruled Roland's issues, we affirm the district court's judgment affirming the Commission's order.

_____
Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Puryear and Field

Affirmed on Motion for Rehearing

Filed: February 27, 2015

_____

[40] *See, e.g.*, Tex. Nat. Res. Code § 89.002(12) (defining "inactive well" as "unplugged well that has had no reported production . . . for a period of greater than 12 months").

[41] *See, e.g.*, *R.D. Oil Co. v. Railroad Comm'n*, 849 S.W.2d 871, 872 (Tex. App.—Austin 1993, no writ) (describing plugging as pouring cement into the well casing); Railroad Comm'n, *Well Plugging Primer* 6–7 (200), available at http://www.rrc.state.tx.us/media/6358/plugprimer1.pdf (showing that operator plugs a well by pumping cement down it and, if done properly, seals the well, preventing water and other substances from leaking into it and gas or oil from leaking out).

[42] *See Texas Indus. Energy*, 324 S.W.3d at 105; *Gulf States Util.*, 809 S.W.2d at 211.

18